122 F.3d 58
 PHILIP MORRIS INCORPORATED, R.J. Reynolds Tobacco Company,
Brown & Williamson Tobacco Corporation, and
Lorillard Tobacco Company, Plaintiffs, Appellants,
v.
L. Scott HARSHBARGER, Attorney General of the Commonwealth
of Massachusetts, and David H. Mulligan,
Massachusetts Commissioner of Public
Health, Defendants, Appellees.
UNITED STATES TOBACCO COMPANY, Brown & Williamson Tobacco
Corporation, Conwood Company, L.P., National Tobacco
Company, L.P., The Pinkerton Tobacco Company, and Swisher
International, Inc., Plaintiffs, Appellants,
v.
L. Scott HARSHBARGER, Attorney General of the Commonwealth
of Massachusetts, and David H. Mulligan,
Massachusetts Commissioner of Public
Health, Defendants, Appellees.
 Nos. 97-8022, 97-8023.
 United States Court of Appeals,
First Circuit.
 Heard June 6, 1997.
Decided Aug. 18, 1997.
 
 Henry C. Dinger, P.C., with whom Cerise Lim-Epstein, Goodwin, Procter & Hoar, LLP, Boston, MA, Verne W. Vance, Jr., Foley, Hoag & Eliot, Herbert Dym, E. Edward Bruce, David H. Remes, Jarrett A. Williams, Jason A. Levine, and Covington & Burling, Washington, DC, were on brief for Philip Morris appellants.
 George J. Skelly, with whom Thomas J. Dougherty, Skadden, Arps, Slate, Meagher & Flom LLP, A. Hugh Scott, Denise W. DeFranco, Choate, Hall & Stewart, Boston, MA, John L. Oberdorfer, Stuart M. Pape, G. Kendrick MacDowell, and Patton Boggs, L.L.P., Washington, DC, were on brief for United States Tobacco Company appellants.
 Rebecca P. McIntyre, Assistant Attorney General, with whom Thomas A. Barnico, Assistant Attorney General and L. Scott Harshbarger, Attorney General, Boston, MA, were on brief for appellees.
 Carol J. Bennett, James P. Jacobson, Ann Beimdiek Kinsella, D. Douglas Blanke, Attorneys for State of Minnesota, Hubert H. Humphrey III, Attorney General for State of Minnesota, St. Paul, MN, Grant Woods, Attorney General for State of Arizona, Phoenix, AZ, Winston Bryant, Attorney General for State of Arkansas, Daniel E. Lundgren, Attorney General for State of California, Richard Blumenthal, Attorney General for State of Connecticut, Hartford, CT, Robert A. Butterworth, Attorney General for State of Florida, Tallahassee, FL, Margery S. Bronster, Attorney General for State of Hawaii, Honolulu, HI, James E. Ryan, Attorney General for State of Illinois, Chicago, IL, Jeffrey A. Modisett, Attorney General for State of Indiana, Indianapolis, IN, Thomas J. Miller, Attorney General for State of Iowa, Des Moines, IA, J. Joseph Curran, Jr., Attorney General for State of Maryland, Baltimore, MD, Frank J. Kelley, Attorney General for State of Michigan, Lansing, MI, Mike Moore, Attorney General for State of Mississippi, Jackson, MS, Jeremiah W. (Jay) Nixon, Attorney General for State of Missouri, Jefferson City, MO, Joseph P. Mazurek, Attorney General for State of Montana, Helena, MT, Frankie Sue Del Papa, Attorney General for State of Nevada, Carson City, NV, Peter Verniero, Attorney General for State of New Jersey, Tom Udall, Attorney General for State of New Mexico, Santa Fe, NM, Dennis C. Vacco, Attorney General for State of New York, Brooklyn, NY, Heidi Heitkamp, Attorney General for State of North Dakota, Bismarck, ND, Betty D. Montgomery, Attorney General for State of Ohio, Columbus, OH, W.A. Drew Edmondson, Attorney General for State of Oklahoma, Oklahoma City, OK, Hardy Myers, Attorney General for State of Oregon, Salem, OR, D. Michael Fisher, Attorney General for State of Pennsylvania, Harrisburg, PA, Jeffrey B. Pine, Attorney General for State of Rhode Island, Providence, RI, Mark Barnett, Attorney General for State of South Dakota, Pierre, SD, Dan Morales, Attorney General for State of Texas, Austin, TX, Jan Graham, Attorney General for State of Utah, Salt Lake City, UT, William Sorrell, Attorney General for State of Vermont, Burlington, VT, Christine O. Gregoire, Attorney General for State of Washington, Olympia, WA, Darrell V. McGraw, Jr., Attorney General for State of West Virginia, Charleston, WV, James E. Doyle, Attorney General for State of Wisconsin, Madison, WI, Louise H. Renne, City Attorney, City of San Francisco, CA, Elizabeth D. Laporte, Chief of Special Litigation, City of San Francisco, CA, and Andrew Y.S. Cheng, Deputy City Attorney, City of San Francisco, CA, San Francisco, CA, on brief amici curiae.
 Before TORRUELLA, Chief Judge, CAMPBELL, Senior Circuit Judge, and STAHL, Circuit Judge.
 STAHL, Circuit Judge.
 
 
 1
 This appeal implicates the constitutionality of a Massachusetts statute requiring manufacturers of tobacco products to disclose the additives and nicotine-yield ratings of their products to the state's public health department. See Mass. Gen. Laws ch. 94, § 307B (the "Disclosure Act"). Plaintiffs-appellants, various manufacturers of cigarette and smokeless tobacco products (collectively, "the manufacturers"),[1] appeal the district court's grant of summary judgment in favor of defendants-appellees, the Attorney General of the Commonwealth of Massachusetts and the Massachusetts Public Health Commissioner (collectively, the "Commonwealth").[2] The district court ruled that neither the Federal Cigarette Labeling and Advertising Act, as amended (the "FCLAA"), 15 U.S.C. §§ 1331-41, nor the Comprehensive Smokeless Tobacco Health Education Act of 1986 (the "Smokeless Tobacco Act"), 15 U.S.C. §§ 4401-08, preempts enforcement of the Disclosure Act. We affirm the district court's ruling, and hold that the Massachusetts Disclosure Act survives the manufacturers' preemption challenge.
 
 I.
 Prior Proceedings
 
 2
 On August 2, 1996, the day Massachusetts enacted the Disclosure Act, the cigarette manufacturers and smokeless tobacco manufacturers separately filed complaints in the district court claiming that the FCLAA and the Smokeless Tobacco Act preempt the state law by operation of the Supremacy Clause of the U.S. Constitution. Their complaints also allege that the Disclosure Act violates the Constitution's Commerce Clause, Full Faith and Credit Clause, Fourteenth Amendment Due Process Clause, and Takings Clause. The parties cross-moved for summary judgment in each case on the preemption claim only.[3] After denying the manufacturers' motions and granting the Commonwealth's motions, the district court amended its orders to certify the rulings for immediate appeal. See 28 U.S.C. § 1292(b). We accepted interlocutory review of the orders. This appeal, therefore, presents only the preemption issue.II.
 
 Standard of Review
 
 3
 We review the district court's summary judgment ruling de novo. Grenier v. Vermont Log Bldgs., Inc., 96 F.3d 559, 562 (1st Cir.1996).[4] The ultimate determination whether federal law preempts the Massachusetts Disclosure Act presents a legal question subject to plenary review. See United States v. Rhode Island Insurers' Insolvency Fund, 80 F.3d 616, 619 (1st Cir.1996).
 
 III.
 Background
 
 4
 We begin our discussion with a review of the Massachusetts Disclosure Act and the allegedly preempting federal laws, the FCLAA and the Smokeless Tobacco Act. In so doing, we consider the statutes' respective texts along with the relevant historical and legislative contexts in which they were enacted. See Wood v. General Motors Corp., 865 F.2d 395, 404 (1st Cir.1988) ("In determining questions of preemption, a court 'must examine the [act's] language against the background of its legislative history and historical context.' " (quoting California Federal Sav. & Loan Ass'n v. Guerra, 479 U.S. 272, 284, 107 S.Ct. 683, 691, 93 L.Ed.2d 613 (1987))). Next, we set forth controlling preemption principles. Finally, we turn to the question whether the federal statutes in question either expressly or impliedly preempt the state statute. We note here that the Supreme Court's splintered decision in Cipollone v. Liggett Group, Inc., 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) heavily influences, and in part controls, much of our analysis.
 
 A. The Disclosure Act
 
 5
 The Massachusetts Disclosure Act, the first state law of its kind, requires "any manufacturer of cigarettes, snuff or chewing tobacco sold in the commonwealth" to provide the Massachusetts Department of Public Health with a yearly report that lists for each brand of product (1) any added constituents "in descending order according to weight, measure, or numerical count," and (2) nicotine yield ratings "which shall accurately predict nicotine intake for average consumers." Mass. Gen. Laws ch. 94, § 307B.[5] The Disclosure Act permits public access to the information reported upon an appropriate finding by the department. Specifically, the Disclosure Act provides:
 
 
 6
 The nicotine yield ratings so provided, and any other such information in the annual reports with respect to which the department determines that there is a reasonable scientific basis for concluding that the availability of such information could reduce risks to public health, shall be public records.
 
 
 7
 Id.
 
 
 8
 The public health department may not reveal the information, however, "unless and until the attorney general advises that such disclosure would not constitute an unconstitutional taking." Id. Despite the apparent limitations on the public health department's ability to disclose reported information, the record evidence strongly indicates that Massachusetts officials intend to publicize the information. At oral argument before us, the Commonwealth avoided direct questions on this issue, asserting that the department's potential publication of the information was irrelevant for the purposes of preemption analysis. For the purposes of this case, we assume that the department will make the information publicly available at the first legal and practical opportunity.
 
 
 9
 By all indications, the purpose of the Disclosure Act is to further the public health and education in the use of tobacco products. Most tellingly, the law prefaces its requirements with the phrase, "For the purpose of protecting the public health." Mass. Gen. Laws. ch. 94, § 307B. In addition, a press release from the Massachusetts Executive Department released the same day the law was enacted describes the Disclosure Act as a "consumer protection law" intended to foster educated decision-making on the part of the consuming public when choosing specific tobacco products and brands.
 
 B. The Federal Laws
 1. FCLAA
 
 10
 In 1964, the United States Surgeon General's advisory committee issued a report that officially acknowledged the health hazards of cigarette smoking. See Cipollone, 505 U.S. at 513, 112 S.Ct. at 2616. In response, the Federal Trade Commission, as well as several states, moved to impose various warning requirements in the advertising and labeling of cigarettes. Id.; see also Palmer v. Liggett Group, Inc., 825 F.2d 620, 622 n. 1 (1st Cir.1987) (noting example of New York State's warning label requirement). In light of "the potential maze of conflicting state regulations" on the subject, Palmer, 825 F.2d at 622, and after "vigorous lobbying by all forms of interested groups and business," id. at 623, Congress passed the first version of the FCLAA in 1965 (the "1965 Act").
 
 
 11
 Congress expressly declared its "policy and purpose" in passing the 1965 Act:
 
 
 12
 It is the policy of the Congress, and the purpose of this chapter, to establish a comprehensive Federal program to deal with cigarette labeling and advertising with respect to any relationship between smoking and health, whereby--
 
 
 13
 (1) the public may be adequately informed that cigarette smoking may be hazardous to health by inclusion of a warning to that effect on each package of cigarettes; and
 
 
 14
 (2) commerce and the national economy may be (A) protected to the maximum extent consistent with this declared policy and (B) not impeded by diverse, nonuniform, and confusing cigarette labeling and advertising regulations with respect to any relationship between smoking and health.
 
 
 15
 15 U.S.C. § 1331.
 
 
 16
 The Cipollone majority determined that the congressional purposes expressed in this provision were as follows:
 
 
 17
 (1) adequately informing the public that cigarette smoking may be hazardous to health, and (2) protecting the national economy from the burden imposed by diverse, nonuniform, and confusing cigarette labeling and advertising regulations.
 
 
 18
 505 U.S. at 514, 112 S.Ct. at 2616. The Court explained that the 1965 Act contained specific provisions "[i]n furtherance of" these two congressional purposes. Id. To further the first purpose, the 1965 Act mandated a specific warning label on each cigarette package: "CAUTION: CIGARETTE SMOKING MAY BE HAZARDOUS TO YOUR HEALTH." Id.[6] To further the second purpose, see id., the statute included a preemption provision, which, in part, prohibited the requirement of any "statement relating to smoking and health ... on any cigarette package" other than the required warning. 15 U.S.C. § 1334(a). The 1965 Act's preemption clause further provided:
 
 
 19
 (b) No statement relating to smoking and health shall be required in the advertising of any cigarettes the packages of which are labeled in conformity with the provisions of this Act.
 
 
 20
 15 U.S.C. § 1334(b) (1966), amended by 15 U.S.C. § 1334(b) (1969).
 
 
 21
 By its own terms, the 1965 Act's provisions pertaining to advertising were to terminate on July 1, 1969. See Cipollone, 505 U.S. at 514, 112 S.Ct. at 2616. As that date approached, various federal agencies and states proposed new and differing cigarette advertising regulations.[7] See id. at 514-15, 112 S.Ct. at 2616-17. Faced with these various initiatives, Congress amended the 1965 Act by enacting the Public Health Cigarette Smoking Act of 1969 (the "1969 Act"). The 1969 Act strengthened the wording of the required warning label: "WARNING: THE SURGEON GENERAL HAS DETERMINED THAT CIGARETTE SMOKING IS DANGEROUS TO YOUR HEALTH." 15 U.S.C. § 1333 (1969). The 1969 Act also prohibited cigarette advertising on television and radio and any other "medium of electronic communication subject to the jurisdiction of the Federal Communications Commission." 15 U.S.C. § 1335. Relatedly, the 1969 Act replaced subsection (b) of the 1965 Act's preemption provision with the following language, which remains unmodified to this day:
 
 
 22
 (b) No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this chapter.
 
 15 U.S.C. § 1334(b).[8]
 
 23
 The Senate Report accompanying the 1969 Act explained that the revised preemption provision was necessary "to avoid the chaos created by a multiplicity of conflicting [cigarette advertising] regulations." S.Rep. No. 91-566 (1970), reprinted in 1970 U.S.C.C.A.N. 2652, 2663. Senate Report 566 further explained:
 
 
 24
 The State preemption of regulation or prohibition with respect to cigarette advertising is narrowly phrased to preempt only State action based on smoking and health. It would in no way affect the power of any State or political subdivision of any State with respect to the taxation or the sale of cigarettes to minors, or the prohibition of smoking in public buildings, or similar police regulations. It is limited entirely to State or local requirements or prohibitions in the advertising of cigarettes.
 
 
 25
 Id.
 
 
 26
 After thirteen years of scientific research following the enactment of the 1969 Act, Congress further amended the FCLAA in 1984. See H.R.Rep. No. 98-805, at 12 (1984), reprinted in 1984 U.S.C.C.A.N. 3718, 3725. Renewed congressional action in this area was in part prompted by Surgeon General reports identifying cigarette smoking as a significant risk factor in certain health problems. See id. (citing various reports). In light of the Surgeon General's findings and testimony before congressional committees on the adverse health effects of smoking, Congress passed the Comprehensive Smoking Education Act of 1984 (the "CSEA"). House Report 805 states that the CSEA's purpose was "to assist the public to make an informed decision about whether or not to smoke" "[b]y updating the cigarette warning, by giving visibility and emphasis to smoking research and educational activities at the Federal level, and by working closer with the private voluntary health section." Id.
 
 
 27
 Specifically, the CSEA amended the FCLAA by establishing a new warning system employing four different smoking and health messages that would alternate quarterly on both cigarette packages and cigarette advertisements. See 15 U.S.C. § 1333.[9] To reflect the new multiple-warning system, Congress amended the language in the statute's purpose provision from "a warning ... on each package of cigarettes [that] cigarette smoking may be hazardous to health" to "warning notices on each package of cigarettes and in each advertisement of cigarettes [to inform the public] about any adverse health effects of cigarette smoking." § 1331(1); see also H.R.Rep. No. 98-805, at 21, 1984 U.S.C.C.A.N. at 3734.
 
 
 28
 Significantly, the CSEA inserted an ingredient reporting provision that requires cigarette manufacturers to "annually provide the Secretary [of Health and Human Services] with a list of the ingredients added to tobacco in the manufacture of cigarettes which does not identify the company which uses the ingredients or the brand of cigarettes which contain the ingredients." § 1335a(a). The provision permits, but does not mandate, "[a] person or group of persons required to provide [the list] ... [to] designate an individual or entity to provide the list." Id. In other words, to satisfy their respective reporting obligations, the manufacturers at their option may submit ingredient lists to a designated agent who, in turn, may transmit the information aggregately to the Secretary. Based on the information provided, the Secretary must transmit a report to Congress, "[a]t such times as the Secretary considers appropriate," on research activities regarding the health effects or risks of cigarette additives and "any other information which the Secretary determines to be in the public interest." § 1335a(b)(1).[10]
 
 
 29
 The ingredient reporting provision sets forth comprehensive procedures for the Secretary's handling of the information provided. Specifically, § 1335(b)(2)(A) provides:
 
 
 30
 Any information provided to the Secretary under subsection (a) of this section shall be treated as trade secret or confidential information subject to section 552(b)(4) of Title 5 [providing a trade secret exemption for disclosure under the Freedom of Information Act] and section 1905 of Title 18 [criminalizing disclosure of confidential information by federal officers or employees] and shall not be revealed, except as provided in paragraph (1) [respecting the Secretary's report to Congress], to any person other than those authorized by the Secretary in carrying out their official duties under this section.
 
 
 31
 Despite the above-quoted section, a different section directs that the Secretary may not withhold the ingredient information from a requesting congressional committee or subcommittee. See § 1335a(b)(2)(B).[11] When faced with such a request, the Secretary must make the list available "and shall, at the same time, notify in writing the person who provided the list of such request." Id.[12]
 
 
 32
 Finally, the ingredient reporting provision requires the Secretary to ensure the confidentiality of the provided information through specified procedures, including (1) a designated custodian of the information who, when the information is not in use, "shall store it in a locked cabinet or file" and shall keep a record of those inspecting or using the information, § 1335a(b)(2)(C), and (2) a requirement that persons "permitted access to the information shall be instructed in writing not to disclose the information to anyone who is not entitled to have access to the information." Id.[13]
 
 2. Smokeless Tobacco Act
 
 33
 By the mid-1980's, Congress became concerned that the federal government's activities regarding the health hazards of cigarette smoking had no parallel with respect to smokeless tobacco products such as chewing tobacco and snuff. See S.Rep. No. 99-209, at 3-4 (1986), reprinted in 1986 U.S.C.C.A.N. 7, 9-10. According to the Senate Report, the almost-forgotten smokeless tobacco industry had staged a recent resurgence, and its products had become popular among youth who apparently considered such products a safe alternative to cigarette smoking. See id. Further evidence suggested that smokeless tobacco products contained "significant levels of nicotine" and were linked with serious health problems, including oral cancer. S.Rep. No. 99-209, at 3, 1986 U.S.C.C.A.N. at 9. These factors led to regulatory action on various fronts regarding warning requirements. For example, a Massachusetts executive order required warning labels on the packages and in the advertisements of smokeless tobacco products. Id. Additionally, prominent health organizations called for legislation requiring warnings, and the FTC enlisted the Surgeon General's help in considering a petition seeking warning label requirements. See S.Rep. No. 99-209, at 4-5, 1986 U.S.C.C.A.N. at 10-11.
 
 
 34
 In response to such regulatory efforts, Congress passed the Comprehensive Smokeless Tobacco Health Education Act of 1986 (the "Smokeless Tobacco Act"). The Senate Report explains that the Act, "for the most part, simply extends the provisions of ... the Comprehensive Smoking Education Act of 1984, to include smokeless tobacco products." S.Rep. No. 99-209, at 5, 1986 U.S.C.C.A.N. at 11. Thus, the Smokeless Tobacco Act contains features similar, but not identical, to the FCLAA as amended by the CSEA.
 
 
 35
 Like the CSEA, the Smokeless Tobacco Act calls for the Secretary of Health and Human Services to "establish and carry out a program to inform the public of any dangers to human health resulting from the use of smokeless tobacco products." 15 U.S.C. § 4401. The statute bans the advertising of smokeless tobacco on radio and television, see 15 U.S.C. § 4402(f), and establishes a rotating warning requirement for package labels and advertising, with specific warnings regarding the potential adverse health effects of smokeless tobacco products. See § 4402.[14]
 
 
 36
 Congress included in the Smokeless Tobacco Act an express preemption provision which states, in pertinent part:
 
 
 37
 No statement relating to the use of smokeless tobacco products and health, other than the statements required by [this act], shall be required by any State or local statute or regulation to be included on any package or in any advertisement ... of a smokeless tobacco product.
 
 
 38
 15 U.S.C. § 4406(b).[15] Unlike the FCLAA, the Smokeless Tobacco Act contains a "savings clause," which provides: "Nothing in this chapter shall relieve any person from liability at common law or under State statutory law to any other person." 15 U.S.C. § 4406(c).[16]
 
 
 39
 The Smokeless Tobacco Act similarly provides for anonymous and aggregate ingredient reporting to the Secretary of Health and Human Services. § 4403(a).[17] Unlike the FCLAA, however, the Smokeless Tobacco Act also requires smokeless tobacco manufacturers to specify the nicotine quantity contained in each product. Id. The statute's provisions for the Secretary's handling of the information are essentially identical to those in the FCLAA, except for the absence of a cross reference to 18 U.S.C. § 1905, which criminalizes unauthorized disclosure of confidential information. Compare 15 U.S.C. § 1335(b)(2)(A) with 15 U.S.C. § 4403(b)(2). The statute also requires the Secretary to transmit informative and advisory reports to Congress. See 15 U.S.C. § 4407.
 
 C. Preemption Principles
 
 40
 Having reviewed the federal and state statutes at issue in this case, we now consider the preemption principles that control our analysis of the question whether federal law either explicitly or impliedly preempts the challenged state law. We begin by noting that the health and safety of each state's citizens "are primarily, and historically, matters of local concern." Medtronic v. Lohr, --- U.S. ----, ----, 116 S.Ct. 2240, 2245, 135 L.Ed.2d 700 (1996). Accordingly, "the States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort and quiet of all persons." Id. (internal quotation marks, citations, and alterations omitted). The Massachusetts Disclosure Act comfortably falls within the "health and safety" realm of traditional state police powers. Cf. Wisconsin Public Intervenor v. Mortier, 501 U.S. 597, 605, 111 S.Ct. 2476, 2482, 115 L.Ed.2d 532 (1991) (indicating that regulation of hazardous pesticides are matters of the states' "historic police powers"); Tart v. Massachusetts, 949 F.2d 490, 501 (1st Cir.1991) (confirming state's "police power" to regulate the transshipment of raw fish).
 
 
 41
 Nevertheless, Article VI of the United States Constitution provides that federal law "shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. Art. VI, cl. 2. As a result, "any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." Gade v. National Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 108, 112 S.Ct. 2374, 2388, 120 L.Ed.2d 73 (1992) (internal quotation marks and citations omitted). Thus, in this case, we must determine whether the Disclosure Act sufficiently interferes with, and therefore must yield either to the FCLAA or the Smokeless Tobacco Act, or both.
 
 
 42
 In any preemption analysis, "[t]he purpose of Congress is the ultimate touchstone." Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 138, 111 S.Ct. 478, 482, 112 L.Ed.2d 474 (1990) (internal quotation marks and citations omitted). The Supreme Court recently framed the crucial inquiry as follows: "Did Congress, in enacting the Federal Statute, intend to exercise its constitutionally delegated authority to set aside the laws of a State?" Barnett Bank v. Nelson, 517 U.S. 590, ----, 116 S.Ct. 1103, 1107, 134 L.Ed.2d 237 (1996). To discern Congress' intent, "we examine the explicit statutory language and the structure and purpose of the statute." Ingersoll-Rand Co., 498 U.S. at 138, 111 S.Ct. at 482.
 
 
 43
 One method by which Congress may evince preemptive intent is through explicit preemption language. See Jones v. Rath Packing Co., 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977). Although Congress need not employ express preemption language to communicate such intent, see International Paper Co. v. Ouellette, 479 U.S. 481, 492, 107 S.Ct. 805, 811, 93 L.Ed.2d 883 (1987), when Congress so chooses, our task in divining its intent with respect to the issue at hand may be "an easy one," English v. General Elec. Co., 496 U.S. 72, 79, 110 S.Ct. 2270, 2275, 110 L.Ed.2d 65 (1990).
 
 
 44
 "More often, explicit pre-emption language does not appear, or does not directly answer the question. In that event, courts must consider whether the federal statute's 'structure and purpose,' or nonspecific statutory language, nonetheless reveal a clear, but implicit, pre-emptive intent." Barnett Bank, 517 U.S. at ----, 116 S.Ct. at 1108 (quoting Jones, 430 U.S. at 525, 97 S.Ct. at 1309). Thus, for example, state law is impliedly preempted to the extent it "actually conflicts" with federal law. See Cipollone, 505 U.S. at 516, 112 S.Ct. at 2617. Actual conflict occurs where compliance with both state and federal law is a "physical impossibility," Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 143, 83 S.Ct. 1210, 1218, 10 L.Ed.2d 248 (1963), or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). Additionally, the pervasiveness of a federal scheme, the dominance of the federal interest, or the federal goals and obligations may reasonably permit an inference that Congress intended a federal law to "occupy a field" of commerce exclusively, disallowing concurrent state operation or supplementation even where the state law does not otherwise "conflict" with federal law. See Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947).[18]
 
 
 45
 Finally, there exists an assumption that federal law does not supersede a state's historic police powers " 'unless that [is] the clear and manifest purpose of Congress.' " Cipollone, 505 U.S. at 516, 112 S.Ct. at 2617 (quoting Rice, 331 U.S. at 230, 67 S.Ct. at 1152); see Hillsborough County v. Automated Medical Labs., 471 U.S. 707, 715, 105 S.Ct. 2371, 2376, 85 L.Ed.2d 714 (1985) (noting "presumption that state or local regulation of matters related to health and safety is not invalidated under the Supremacy Clause"); see also De Buono v. NYSA-ILA Medical & Clinical Svcs. Fund, --- U.S. ----, ----, 117 S.Ct. 1747, 1751, 138 L.Ed.2d 21 (1997). The "health and safety" presumption applies in both express and implied preemption analyses. See Greenwood Trust Co. v. Commonwealth, 971 F.2d 818, 823 (1st Cir.1992) ("Even federal statutes that contain express preemption clauses must be viewed through the prism of [the] assumption."); see also Vango Media, Inc. v. City of New York, 34 F.3d 68, 72 (2d Cir.1994) (noting that presumption applies "[w]hether preemption under the Supremacy Clause be explicit, or implied under field preemption, or under conflict preemption") (involving preemptive effect of FCLAA over city ordinance respecting tobacco-product advertising).[19] The Disclosure Act, being an exercise of the Commonwealth's police powers to protect the health and safety of her citizens, benefits from the presumption against preemption.
 
 
 46
 While these principles are readily enough stated, their application in practice can be rather difficult because each preemption scenario necessarily involves a unique intersection of federal and state law. See Hines, 312 U.S. at 67, 61 S.Ct. at 404 (explaining that, with respect to preemption analysis, there is no "rigid formula or rule which can be used as a universal pattern to determine the meaning and purpose of every act of Congress"). Thus, our task requires us to scrutinize the relevant statutory language, in light of Congress' evident purpose and pertinent case law, to determine whether Congress intended to preempt state laws such as the Disclosure Act.
 
 IV.
 Analysis
 A. Express Preemption
 
 47
 Because Congress included express preemption language in both the FCLAA and the Smokeless Tobacco Act, "our initial concern is with express preemption and with the reach of the clause[s] in question." Wilson v. Bradlees of New Eng., Inc., 96 F.3d 552, 554 (1st Cir.1996), cert. denied, --- U.S. ----, 117 S.Ct. 1083, 137 L.Ed.2d 218 (1997). In this analysis, we compare the Disclosure Act with the language of the preemption clauses and cases interpreting it to determine whether the state law falls within the intended preemptive scope. See Grenier, 96 F.3d at 562. We discuss each statute in turn.
 
 1. FCLAA
 
 48
 Because the Disclosure Act does not require a "statement relating to smoking and health ... on any cigarette package," 15 U.S.C. § 1334(a) (emphasis added), we are concerned only with § 1334(b), which provides:
 
 
 49
 No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this chapter.
 
 
 50
 15 U.S.C. § 1334(b).
 
 
 51
 a. Cipollone
 
 
 52
 We begin with Cipollone, which concerned the viability of state common-law damages actions against cigarette manufacturers for injuries stemming from the lung-cancer death of Rose Cipollone. See 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). The Court analyzed the statutory preemption language of both the 1965 and 1969 Acts, but because the plaintiffs' claims arose before 1984, the Court did not consider the CSEA's potential effect on those claims. See id. at 508, 112 S.Ct. at 2613. In the Court's mixed ruling, Justice Stevens' opinion spoke for a majority of the Court in certain sections, but largely represented the views of only a plurality of the Court. The ruling also produced two separate opinions concurring in part and dissenting in part. Principally, the Justices disagreed over whether or not state common-law damages actions, as opposed to positive enactments by state legislatures or administrative bodies, fell within the scope of the express preemption provisions in the 1965 and 1969 Acts. While a majority of the Court held that the 1965 Act did not preempt state common-law damages actions, see Cipollone, 505 U.S. at 518-19, 112 S.Ct. at 2618-19, a plurality found that the 1969 Act's "broader" preemption language did encompass some common law claims, see id. at 520-21, 112 S.Ct. at 2619-20.
 
 
 53
 To determine whether or not a particular common law claim fell within the express preemption clause, the plurality formulated the following "central inquiry": "we ask whether the legal duty that is the predicate of the common-law damages action constitutes a 'requirement or prohibition based on smoking and health ... imposed under State law with respect to ... advertising and promotion,' giving that clause a fair but narrow reading." Id. at 524, 112 S.Ct. at 2621.[20] According to the plurality, "each phrase within that clause limits the universe of common-law claims pre-empted by the statute." Id. In Lohr, a Court majority approved a similar approach. See Lohr, --- U.S. at ----, 116 S.Ct. at 2257 (parsing language in express preemption clause to determine federal statute's preemptive scope); id. at ----, 116 S.Ct. at 2258 (looking to "[t]he legal duty that is the predicate for [plaintiff's common-law state damages claim]" to determine whether or not it was preempted by federal requirements).
 
 
 54
 On this basis, we apply a modified version of the test in this case and ask whether or not the "predicate legal duty" created by the Disclosure Act constitutes a(1) a "requirement or prohibition ... imposed under State law," (2) "based on smoking and health," (3) "with respect to the advertising or promotion of any [properly labeled] cigarettes." § 1334(b).[21]
 
 
 55
 b. Application
 
 
 56
 (1) "Requirement or prohibition ... imposed under State law."
 
 
 57
 Although members of the Cipollone Court disagreed over whether a state common-law damages action could constitute a "requirement" under § 1334(b), the Court unanimously agreed that "positive enactments" are state-imposed "requirement[s] or prohibition[s]" within the meaning of that clause. See 505 U.S. at 521, 112 S.Ct. at 2620 (plurality opinion); 505 U.S. at 525, 112 S.Ct. at 2622 (Blackmun, J., concurring in part, dissenting in part); 505 U.S. at 548, 112 S.Ct. at 2634 (Scalia, J., concurring in part, dissenting in part). The Disclosure Act, being a positive enactment by the Massachusetts state legislature, therefore constitutes a state-imposed "requirement" that falls within the universe of state action potentially preempted by the § 1334(b).[22]
 
 
 58
 (2) "Based on Smoking and Health "
 
 
 59
 We think it clear that the obligations imposed by the Disclosure Act are "based on smoking and health," and the Commonwealth does not dispute this position. The law's stated purpose, "[f]or the purpose of protecting the public health," and the accompanying text strongly imply that its anticipated effect will be greater public awareness about the additives and nicotine in tobacco products and the potential health effects of those ingredients. Mass. Gen. Laws ch. 94, § 307B. The Disclosure Act, therefore, bears the requisite relationship to "smoking and health" within the meaning of § 1334(b). See Vango Media, 34 F.3d at 73 (finding city ordinance requiring display of public health messages about health risks of smoking was "based on smoking and health" because both its purpose and effect centered on such risks); Lacey v. Lorillard Tobacco Co., 956 F.Supp. 956, 962 (N.D.Ala.1997) (stating that a "list of ingredients in cigarettes would most likely be material only as it related to the health of a plaintiff"); Cf. Griesenbeck v. American Tobacco Co., 897 F.Supp. 815, 823 (D.N.J.1995) (finding that "threat of self-immolation arising from the negligent care of one's cigarette is a 'health risk' " bearing the requisite relationship to smoking and health).
 
 
 60
 Courts have found the requisite link to smoking and health lacking where the predicate duty was "a more general obligation," for example, "the duty not to deceive," Cipollone, 505 U.S. at 528-29, 112 S.Ct. at 2623-24 (plurality), the "duty not to conspire to commit fraud," id. at 530, 112 S.Ct. at 2624 (plurality), and the duty "to not engage in unfair competition by advertising illegal conduct or encouraging others to violate the law," Mangini v. R.J. Reynolds Tobacco Co., 7 Cal.4th 1057, 31 Cal.Rptr.2d 358, 875 P.2d 73, 80 (1994) (involving claim that cigarette manufacturer's "Old Joe Camel advertising campaign targets minors for the purpose of inducing and increasing their illegal purchases of cigarettes"). Cf. Lohr, --- U.S. at ----, 116 S.Ct. at 2258 (finding that plaintiffs' negligent manufacturing claim was predicated on the "general duty of every manufacturer to use due care to avoid foreseeable dangers in its products" and thus, the state common-law requirements were not "with respect to" medical devices).
 
 
 61
 Here, the Commonwealth does not argue that the Disclosure Act imposes an obligation so general as to take it out of the smoking-and-health nexus of § 1334(b). While the argument could be made that the Disclosure Act predicates its obligations upon the general duty to follow state statutory reporting requirements rather than state-considerations that are "based on smoking and health," we think such an argument impermissibly raises the level of generality of the inquiry. The logical extension of this argument would be that all obligations stemming from state positive-enactments are predicated on the "general duty" to "abide by state law," thus bringing every such requirement outside the scope of the preemption clause even if it squarely involved otherwise preempted matters. Cf. Cipollone, 505 U.S. at 543, 112 S.Ct. at 2631 (Blackmun, J., concurring in part, dissenting in part) (criticizing plurality's "frequent shift in the level of generality at which it examines the individual claims").
 
 
 62
 (3) "With Respect to the Advertising or Promotion of Any Cigarettes "
 
 
 63
 Having found that the Disclosure Act is a "requirement or prohibition based on smoking and health ... imposed under State law," we turn to the main dispute underlying our express preemption analysis: whether or not the obligations imposed under the Disclosure Act are "with respect to the advertising or promotion of any cigarettes" within the meaning of § 1334(b). At first glance, the Disclosure Act's reporting duties seem entirely unrelated to tobacco industry advertising and promotion. Certainly, as the district court found, the compelled furnishing of additive and nicotine-yield lists to state authorities does not itself constitute "advertising or promotion."[23] Although the cigarette manufacturers do not seriously dispute this conclusion, they submit that the Disclosure Act's requirements are "with respect to" advertising and promotion within the meaning of § 1334(b).
 
 
 64
 The cigarette manufacturers theorize that the FCLAA, through its mandated warning labels and express preemption language, exclusively delineates the necessary and sufficient health information that cigarette manufacturers may be compelled to communicate to the public. They contend that section 1334(b), therefore, in addition to preempting requirements to change cigarette labels or advertisements, prohibits any additional requirement to communicate to the public about smoking and health. The manufacturers reason that the Disclosure Act, although styled as an agency reporting requirement, essentially compels them to communicate additional smoking and health information to the public because the health department will make the information publicly available. They assert that § 1334(b) would be rendered meaningless if the Commonwealth may accomplish indirectly what it may not accomplish directly by using the state agency "as a conduit" for the manufacturers' compelled communication. In short, they claim that the Disclosure Act impermissibly requires them to participate in what amounts to a public service advertising campaign intended to supplement the federally mandated warnings.
 
 
 65
 In Cipollone, two of the Court's opinions specifically analyzed the phrase "with respect to ... advertising and promotion": Justice Stevens' four-vote plurality opinion, which interpreted the phrase narrowly, and Justice Scalia's opinion concurring in part and dissenting in part, in which Justice Thomas joined, which interpreted the phrase more broadly.[24] We note initially that the six Justices represented by these two opinions apparently agreed that the preemption clause reached plaintiffs' failure-to-warn claims, at least insofar as they required proof that the manufacturers' "post-1969 advertising or promotions should have included additional, or more clearly stated, warnings." 505 U.S. at 524, 112 S.Ct. at 2621 (plurality); see id. at 554, 112 S.Ct. at 2637 (Scalia, J., concurring in part, dissenting in part); see also Palmer, 825 F.2d at 627 (explaining that successful failure-to-warn claim effectively compels manufacturers to alter warning labels).
 
 
 66
 The four-member plurality further found, however, that the preemption clause did not bar "[failure-to-warn] claims that rely solely on [the cigarette manufacturers'] testing or research practices or other actions unrelated to advertising or promotion." Cipollone 505 U.S. at 524-25, 112 S.Ct. at 2621-22 (emphasis added). Moreover, under the plurality's reasoning, fraudulent misrepresentation claims survived "insofar as those claims rely on a state-law duty to disclose such facts through channels of communication other than advertising or promotion." Id. at 528, 112 S.Ct. at 2623 (emphasis added). Significantly, the plurality offered the following by way of illustration: "Thus, for example, if state law obliged respondents to disclose material facts about smoking and health to an administrative agency, [sec. 1334(b) ] would not pre-empt a state-law claim based on a failure to fulfill that obligation." Id. (emphasis added).
 
 
 67
 Under the plurality's reasoning, there appears to be little doubt that the Disclosure Act is not "with respect to" advertising or promotion because the manufacturers do not satisfy their obligation to file annual reports to the state health department "through" an advertising or promotion channel. See 505 U.S. at 528, 112 S.Ct. at 2623 (plurality). The agency's potential release of the information to the public would seem to raise no concern with the plurality, which was not otherwise troubled about compelled communication to the public through alternative, non-advertising, non-promotional channels (i.e., in duties underlying certain surviving failure to warn and fraudulent misrepresentation claims), for the purposes of the language at issue. Thus, we believe that the plurality's reasoning militates towards the Commonwealth's position.
 
 
 68
 Justice Scalia's opinion, concurring in part and dissenting in part, disagreed with the plurality's conclusion that a state law claim based on the failure to warn consumers " 'through channels of communication other than advertising or promotion' " would not come within § 1334(b)'s preemptive scope. Id. at 554, 112 S.Ct. at 2637 (Scalia, J., concurring in part, dissenting in part) (quoting plurality opinion, id. at 528, 112 S.Ct. at 2623). While acknowledging that the FCLAA clearly does not preempt claims unrelated to industry advertising and promotion, Justice Scalia reasoned that it preempts "claims based on duties that can be complied with by taking action either within the advertising and promotional realm or elsewhere." Id. at 554, 112 S.Ct. at 2637. Thus, according to Justice Scalia, although a product warning could be communicated in many ways, § 1334(b) would preempt the duty as a whole because it could be satisfied through advertising or promotion. See id. at 554-55, 112 S.Ct. at 2637-38.[25]
 
 
 69
 Justice Scalia's opinion also intimated, however, that a hypothetical law requiring disclosure of product health-hazards to a state public-health agency would bear "no relation" to industry advertising and promotion. Id. at 554, 112 S.Ct. at 2637. He further speculated that such a law "would seem to survive" a proposed "practical compulsion" test to determine the viability of a state law, which he phrased as: "whether the law practically compels the manufacturers to engage in behavior that Congress has barred the States from prescribing directly." Id. at 555, 112 S.Ct. at 2637 (Scalia, J., concurring in part, dissenting in part). Justice Scalia's opinion suggests that because the hypothetical law's requirements could not possibly be satisfied through advertising and promotional efforts, the law would not "practically compel" the manufacturers "to relinquish the advertising and promotion immunity accorded them by the Act." Id. at 555, 112 S.Ct. at 2637.
 
 
 70
 In this case, of course, we are presented with an agency reporting requirement coupled with the probability that the information provided will be made public. Although the health department will likely publicize the required reports, the Disclosure Act does not "practically compel" the manufacturers to communicate smoking and health information to the public within Justice Scalia's explication because, while the communicative action to consumers could alternatively be achieved through advertising and promotional efforts, the Disclosure Act itself admits of no such alternative to compliance. There is no suggestion that the manufacturers could somehow comply with the Disclosure Act simply by changing their advertising or promotional materials. Moreover, direct communication of the additive and nicotine-yield information to the public through some other means would not excuse the manufacturers' duties under the law. Thus viewed, the Disclosure Act would survive even Justice Scalia's more expansive, but distinct minority view of the preemption clause.
 
 
 71
 While our Cipollone-based analysis necessarily draws upon the dicta of six Justices who were not presented with an actual agency-reporting scheme, much less a scheme that contemplates the public release of the information reported, we believe that the Justices' observations suggest a qualitative difference, for § 1334(b) purposes, between direct communication with the public and disclosure to a state agency. The fact that public health agencies exist to serve the public, and the absence of any secrecy mandates in the Cipollone opinions discussing state agency reporting requirements, further suggest that the agency's ultimate use of the information does not bear on the question whether such a reporting scheme relates to advertising and promotion. In the end, we believe that Cipollone weighs strongly in favor of the Commonwealth's position.
 
 
 72
 In the wake of Cipollone, several courts have dealt specifically with the question whether a state statute or common-law damages action, in various contexts, implicates the phrase, "with respect to ... advertising or promotion." § 1334(b). In general, the cases yield a broad interpretation of the language at issue. Not surprisingly, therefore, the manufacturers rely heavily on select language from them. Although none of the cases involves a state-agency reporting scheme, we review them to contextualize the manufacturers' arguments and to indicate how the cases differ from the instant dispute.
 
 
 73
 In Vango Media, Inc. v. City of New York, 34 F.3d 68, 70 (2d Cir.1994), the Second Circuit held that the FCLAA expressly preempted a city ordinance requiring an advertising business to display a minimum of one public health message about the dangers of smoking (or the benefits of not smoking) for every four tobacco advertisements. The court reasoned that the phrase "with respect to" in § 1334(b) is essentially synonymous with "relating to," which, in turn, the Supreme Court has interpreted broadly. Id. at 74 (citing definitions such as "referring to" or "having a connection with"). Although the city ordinance did not require changes in the content of tobacco advertisements, the court found that it impermissibly impacted advertisers and promoters by "impos[ing] conditions on their display of cigarette advertisements." Id. at 75. The court concluded that the city ordinance directly contravened the FCLAA's purpose of avoiding diverse advertising regulations and "tread[ed] on the area of tobacco advertising, even if ... only at the edges." Id. at 74.
 
 
 74
 In this case, the cigarette manufacturers argue that Vango Media establishes that the FCLAA preempts any attempt to require anyone to provide smoking and health messages to the public through any media, even media other than industry advertisements. They argue that the Disclosure Act surely comes within this vast preempted realm. We do not read Vango Media so expansively. In Vango Media, the very display of tobacco advertisements invoked the city ordinance requirements, thus evincing a direct and substantial connection between the ordinance and industry advertising. See id. at 74-75. The Disclosure Act, on the other hand, does not impose conditions upon tobacco advertising or promotional decisions, which are irrelevant to the Disclosure Act's obligations.
 
 
 75
 Moreover, even assuming (without deciding) that "with respect to" is synonymous with "relate to," the Disclosure Act does not "relate to" advertising or promotion because it lacks the requisite "reference to" or "connection with" the preempted realm. See California Labor Standards Enforcement v. Dillingham Construction, --- U.S. ----, ---- - ----, 117 S.Ct. 832, 837-41, 136 L.Ed.2d 791 (1997) (analyzing "relate to" phrase in express preemption language in Employee Retirement Income Security Act of 1974 ("ERISA")); Buono v. NYSA-ILA Medical and Clinical Servs. Fund, --- U.S. ----, ---- - ----, 117 S.Ct. 1747, 1751-52, 138 L.Ed.2d 21 (1997) (same). The Disclosure Act does not make "reference to" advertising and promotion because it does not "act[ ] immediately and exclusively" upon advertising and promotion, and, unlike the ordinance in Vango Media, the existence of such advertising is not "essential to the [state] law's operation." Dillingham Constr., --- U.S. at ----, 117 S.Ct. at 838. The Disclosure Act does not have a "connection with" advertising and promotion because it does not mandate the structure and content of advertising, see id. at ---, 117 S.Ct. at 839, and, while it may somehow "alter[ ] the incentives" in advertising decision-making, it "does not dictate the choices," id. at ---, 117 S.Ct. at 842. Thus, while the ordinance in Vango Media ran afoul of § 1334(b)'s "with respect to" language by analogy to the Court's "relate to" jurisprudence, the Disclosure Act does not.
 
 
 76
 Several other cases have involved state claims that sought to impose liability on tobacco product manufacturers for failing to disclose information to consumers through channels other than traditional advertising or promotion. A few courts have found general allegations in this regard insufficient to escape § 1334(b)'s preemptive reach. See Cantley v. Lorillard Tobacco Co., 681 So.2d 1057, 1061 (Ala.1996) (finding bare allegation that cigarette manufacturers concealed material facts was "inevitably based upon a state law duty to disclose facts through advertising or promotion" because communication with consumers normally occurs only through those channels (internal quotation marks and citation omitted)); Griesenbeck v. American Tobacco Co., 897 F.Supp. 815, 823 (D.N.J.1995) (finding that a claim that cigarette manufacturers "should have warned [of health risk] ... somehow, presumably through some variety of mass-notification" was preempted because "[a] company's attempt to notify its mass market of anything ... is considered 'advertising or promotion' under the general usage of those terms"); cf. Grenier, 96 F.3d at 564 (finding failure-to-warn claims preempted under Federal Insecticide, Fungicide, and Rodenticide Act because plaintiff failed "to set forth a coherent specific claim" that was not based on the preempted realm of labeling or packaging).
 
 
 77
 In another case, a plaintiff creatively premised her failure-to-warn claim on the failure to employ specific "non-promotional communications," such as "public service messages, seminars on smoking cessation and harmful smoking habits, direct mail-outs ..., public advocacy, and lobbying." Sonnenreich v. Philip Morris Inc., 929 F.Supp. 416, 418 (S.D.Fla.1996). The court rejected the proffered alternatives, reasoning that they "employ the same techniques as a traditional advertising or promotional campaign .... [and] are all undertaken with the effect of promoting and fostering a product or an ideology." Id. at 419. The court reasoned that the plaintiff's theory would render the FCLAA "meaningless" because it "suggest[ed] that at the same time [the tobacco manufacturers] were providing the Congressionally-mandated warnings, they were exposing themselves to state law tort liability by failing to use 'non-promotional communications' to disseminate material essentially duplicative of the Surgeon General's warning." Id. at 418.
 
 
 78
 In yet another case more closely analogous to this one, a plaintiff sought an injunction to compel cigarette manufacturers to disclose to consumers "the nature, type, extent and identity" of all cigarette additives. Lacey v. Lorillard Tobacco Co., 956 F.Supp. 956, 958 (N.D.Ala.1997). After reviewing the FCLAA's scheme and obligations, the court found the claim preempted because it was "based upon an alleged duty ... to provide to consumers more information regarding smoking and health than is required by the [FCLAA]," id. at 963, and because its additional disclosure obligations "unavoidably attack[ed]" the manufacturers' advertising and promotion, id. at 962.[26]
 
 
 79
 Here, we are presented with more than a vague "tell-the-consumers-any-way-you-wish" claim. Cipollone, 505 U.S. at 555, 112 S.Ct. at 2637 (Scalia, J., concurring in part, dissenting in part). Specifically, the Disclosure Act requires that ingredient reports be filed with a state agency; the reports themselves are plainly outside the realm of advertising or promotion. Unlike plaintiff's theory in Sonnenreich, the Disclosure Act does not require the manufacturers to produce materials and disseminate information to consumers through techniques, such as seminars or direct mailings, that resemble promotional efforts and impel the fostering of a product ideology. Unlike the plaintiff's claim in Lacey, the Disclosure Act does not impose a duty upon manufacturers to provide additional smoking and health information directly to the public.
 
 
 80
 There would arguably appear to be little difference between requiring manufacturers to disseminate ingredient information directly to the public and requiring them to file such information with a state agency, which, in turn, will make the information publicly available. Nevertheless, there is a difference, and we are unpersuaded by the manufacturers' argument that the difference is not substantively important. Moreover, we find doubtful their expansive interpretation of the with-respect-to-advertising-and-promotion condition.
 
 
 81
 While we need not decide the issue now, we are skeptical of the manufacturers' sweeping proposition that the FCLAA prescribes the exclusive means by which they may be compelled to communicate health information directly to the public. On this point, we find informative the Cipollone plurality's preservation of some claims that were based, in part, on the duty to communicate smoking-and-health information to the public. See 505 U.S. at 524-25, 112 S.Ct. at 2621-22 (failure-to-warn claims); id. at 528, 112 S.Ct. at 2623 (fraudulent misrepresentation claims). The survival of such claims undermines the premise that the FCLAA delineates the exclusive scope of consumer-communication duties, and furthermore suggests the very existence of a subset of such requirements that are wholly unrelated to advertising and promotion. We also find informative the legislative history's repeated reference to the "narrow" and "limited" nature of the preemption provision and declaration that the provision "is limited entirely to State or local requirements or prohibitions in the advertising of cigarettes." S. Rep. 91-566, 1970 U.S.C.C.A.N. at 2663.
 
 
 82
 Our skepticism aside, significantly, the Disclosure Act does not require the manufacturers to communicate directly with consumers. Of course, a quintessential state requirement "with respect to ... advertising and promotion" would be a law mandating changes or additions to the content of cigarette advertisements. One step removed from such a law would be a requirement that manufacturers mass-communicate additional warnings or other smoking-and-health information directly to consumers through channels other than advertising or promotion. At this point, the argument in favor of preemption begins to weaken given the Cipollone plurality's seemingly narrow concern with requirements specifically involving advertising and promotional channels. See 505 U.S. at 524-25, 528, 112 S.Ct. at 2621-22, 2623. Further removed yet would be a requirement to disclose such information to some entity other than the consuming public. While one can imagine subsequent intermediate steps, at some point we reach the agency reporting scheme before us.
 
 
 83
 We think that the agency-reporting scheme prescribed under the Disclosure Act is insufficiently related to the advertising and promotion realm to bring the state law within § 1334(b)'s preemptive scope. As noted above, the reports required under the Disclosure Act do not themselves constitute or resemble promotional material. Once the manufacturers file the reports with the state public health agency, their communicative obligation ceases. They will not be required to disseminate further the reported information, which becomes public (if at all), solely through agency action. Thus, unlike an obligation to advise consumers directly of any information, which may compel the manufacturers to engage in activity resembling advertising and promotional efforts, the Disclosure Act requires no such exertion. In fact, the law separates the normal source of product advertising and promotion, the tobacco industry, from any direct communicative action to the public. That the information contained in the report may eventually become widely disseminated does not transform the manufacturer's initial reporting obligation into an advertising or promotional activity. In our view, an implied transformation of this sort would distort the language of § 1334(b) beyond Congress' intent. In short, the line between "with respect to" and "no relation to" advertising and promotion must be crossed at some point, and although we need not pinpoint that exact location now, we think it has been crossed here.
 
 
 84
 Moreover, we disagree with the manufacturers' argument that the Disclosure Act meets this condition because it reflects the Commonwealth's "impermissible judgment" that the federally-mandated health warnings are inadequate and thus constitutes an attack upon those warnings. The Cipollone plurality specifically rejected the proposition that § 1334(b) broadly preempts any claim that inevitably questions the suitability of the manufacturers' advertising and promotion activities. See 505 U.S. at 525, 112 S.Ct. at 2622 (discussing breach-of-express-warranty claim). As the plurality stated: "The appropriate inquiry is not whether a claim challenges the 'propriety' of advertising and promotion, but whether the claim would require the imposition under state law of a requirement or prohibition based on smoking and health with respect to advertising or promotion." Cipollone, 505 U.S. at 525, 112 S.Ct. at 2622.[27] This observation indicates that the relevant inquiry focuses not upon any relation between advertising and the motivation behind a state law, but upon the law itself and any connection it might have with advertising activities. See Associated Indus. v. Snow, 898 F.2d 274, 279 (1st. Cir.1990) ("Rather than attempt to divine the Massachusetts Legislature's intent in enacting its ... legislation, we look instead to the effect of the regulatory scheme." (footnote omitted)) (involving express preemption analysis). Thus, the mere suggestion that state lawmakers sought passage of the Disclosure Act in part because of their discontent with federal regulatory efforts does not affect our preemption analysis.
 
 
 85
 We find, therefore, that the reach of the FCLAA's express preemption clause, § 1334(b), does not preclude enforcement of the Disclosure Act. We reach this conclusion even assuming that underlying the state law is discontent with the federally mandated warnings and the desire to communicate the additive and nicotine-yield information to the public. Looking to the actual effect of the state law, the Disclosure Act does not require alterations in the industry's advertising and promotional activities, or impose any duty to disclose information through those channels. The state law's obligations are neither triggered by advertising decisions, nor could they be fulfilled by altering cigarette labels or advertisements. The law does not direct the manufacturers to employ any mass-marketing or other techniques even remotely resembling advertising and promotion. In the end, we think that had Congress intended to prohibit the public disclosure of smoking and health information that, at some point, the tobacco-product manufacturers had disgorged under state law, the limited phrase "with respect to advertising and promotion" would be an odd vehicle to reach this end. Thus, we find the explicit preemption language and legislative history insufficient to "clear[ly] and manifest[ly]" overcome the presumption against preemption of a state's traditional powers to legislate for the health and safety of its citizens. Mortier, 501 U.S. at 606, 111 S.Ct. at 2482; see Dillingham Constr., --- U.S. at ----, 117 S.Ct. at 842 ("We could not hold pre-empted a state law in an area of traditional state regulation based on so tenuous a relation without doing grave violence to our presumption that Congress intended nothing of the sort.") (construing express preemption language).[28]
 
 2. Smokeless Tobacco Act
 
 86
 Our inquiry into the scope of the Smokeless Tobacco Act's preemption clause is considerably simpler than the preceding analysis. The Smokeless Tobacco Act provides that
 
 
 87
 No statement relating to the use of smokeless tobacco products and health, other than the statements required by [this act], shall be required by any State or local statute or regulation to be included on any package or in any advertisement (unless the advertisement is an outdoor billboard advertisement of a smokeless tobacco product.)
 
 
 88
 15 U.S.C. § 4406(b) (emphasis added).
 
 
 89
 We find dispositive the phrases "on any package" and "in any advertisement," which differ significantly from the broader "with respect to" language in the FCLAA's preemption provision. Cf. Cipollone, 505 U.S. at 520, 112 S.Ct. at 2619 (plurality) (explaining that the clause, "with respect to ... advertising and promotion," in the 1969 Act was notably broader than its predecessor, "in the advertising," in the 1965 Act); id. at 554, 112 S.Ct. at 2637 (Scalia, J., concurring in part, dissenting in part) (suggesting same). Because the Disclosure Act only requires the manufacturers to file certain reports to the Massachusetts Department of Public Health, plainly it does not require a "statement" of any kind "to be included on any package or in any advertisement."[29] Cf. id. at 518, 112 S.Ct. at 2620 (majority opinion) (explaining that similar language in 1965 Act "merely prohibited ... particular cautionary statements on cigarette labels ... or in cigarette advertisements"). The Smokeless Tobacco Act's express preemption clause, therefore, does not invalidate the Disclosure Act.
 
 
 90
 We observe that our holding is wholly consistent with the Smokeless Tobacco Act's "savings clause" which preserves, inter alia, state common-law failure to warn claims. See 15 U.S.C. § 4406(c); S.Rep. No. 99-209, at 14, 1986 U.S.C.C.A.N. at 13 (also stating that Smokeless Tobacco Act is not intended "to preempt a State's ability to control the promotion or advertising of tobacco products"). If claims directly attacking the adequacy of package labeling and advertising survive the Smokeless Tobacco Act's express preemption clause, then the reporting obligations under the Disclosure Act surely survive as well.
 
 
 91
 We conclude that neither the FCLAA nor the Smokeless Tobacco Act expressly preempts the Massachusetts Disclosure Act.
 
 B. Implied Preemption
 
 92
 1. A Proper Inquiry?
 
 
 93
 Before we turn to the manufacturers' implied pre-emption arguments, we first address the Commonwealth's contention that Cipollone precludes any preemption analysis beyond the scope of the express preemption clause. In Cipollone, the Court held that "the pre-emptive scope of the 1965 Act and the 1969 Act is governed entirely by the express [preemption] language in ... each Act" and explained that "Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted." 505 U.S. at 517, 112 S.Ct. at 2618. The Court further stated: "In this case, the other provisions of the 1965 and 1969 Acts offer no cause to look beyond [the express preemption provision] of each Act. Therefore, we need only identify the domain expressly pre-empted by each of those sections." Id. at 517, 112 S.Ct. at 2618.
 
 
 94
 Subsequent to Cipollone, the Court clarified the appropriate approach to implied preemption issues in cases in which express preemption language exists. In Freightliner Corp. v. Myrick, 514 U.S. 280, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995), the Court acknowledged Cipollone 's holding "that the pre-emptive scope of the two statutes at issue was governed by the language in each act," id. at 288, 115 S.Ct. at 1487, but further explained that "[t]he fact that an express definition of the pre-emptive reach of a statute 'implies'--i.e., supports a reasonable inference--that Congress did not intend to pre-empt other matters does not mean that the express clause entirely forecloses any possibility of implied pre-emption," id. at 288, 115 S.Ct. at 1488. Thus, the Court concluded, "[a]t best, Cipollone supports an inference that an express pre-emption clause forecloses implied pre-emption; it does not establish a rule." Id. at 289, 115 S.Ct. at 1488.
 
 
 95
 In this case, the manufacturers' implied preemption arguments are largely based on the ingredient reporting provisions added to the FCLAA by the CSEA in 1984, which were not at issue in Cipollone. See 505 U.S. at 508, 112 S.Ct. at 2613. Thus, the Cipollone Court's refusal to look beyond the express preemption clauses for the purposes of analysis under the 1965 and 1969 Acts does not per se foreclose an implied preemption analysis based on the 1984 amendments. Thus, while we might be tempted to end our preemption analysis here, we feel compelled to explore the manufacturers' implied preemption theories.
 
 
 96
 We are bound, however, by the Cipollone majority's holding that § 1334(b) governs the preemptive scope of the 1965 and 1969 Acts. Having found that the Disclosure Act falls outside the domain of § 1334(b), we engage in an implied preemption analysis only to the extent it relies on the amendments wrought by the CSEA in 1984. In other words, we are not at liberty to address any implied preemption theories based solely on the FCLAA in its 1965 or 1969 versions, independent of the CSEA. Moreover, given that a majority of the Court has indicated that the FCLAA's express preemption clause implies that matters outside its scope are not preempted, see Cipollone, 505 U.S. at 517, 112 S.Ct. at 2618, it becomes apparent that any attempt to surmount the presumption against preemption of the state's historic police powers under an implied preemption theory faces a considerable obstacle. See Snow, 898 F.2d at 282 ("The burden of overcoming th[e] presumption in favor of state law is heavy in those cases that rely on implied preemption, which rests in turn on inference" (internal quotation marks and citations omitted)).
 
 2. Manufacturers' Arguments
 
 97
 As detailed above, both the FCLAA and Smokeless Tobacco Act direct tobacco-product manufacturers to provide to the Secretary of Health and Human Services an annual ingredients list which does not identify the manufacturer or the brand represented by the list, information which may be submitted aggregately by more than one manufacturer through an agent. See 15 U.S.C. §§ 1335a(a), 4403(a). Under both statutes, the information provided is "treated as a trade secret or confidential information," and its unauthorized disclosure is forbidden. See §§ 1335a(b)(2)(A), 4403(b)(2)(A).[30] The laws further require the Secretary to establish written procedures by which the information will be safeguarded and specifically mandates that those procedures include certain custodial, storing, and access arrangements. See §§ 1335a(b)(2)(C), 4403(b)(2)(C). The manufacturers contend that the Disclosure Act is impliedly preempted in light of these provisions combined with the structure and purpose of the statutes.
 
 
 98
 The manufacturers do not rely, nor could they rely, on the theory that compliance with both the Disclosure Act and federal law presents a "physical impossibility." See Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 143, 83 S.Ct. 1210, 1218, 10 L.Ed.2d 248 (1963). Rather, they contend that the Disclosure Act impermissibly conflicts with the purpose and objectives that underlie the federal statutes. They further contend, albeit less elaborately, that the state law invades a field of commerce for which Congress intended exclusive federal regulation.
 
 
 99
 Specifically, the manufacturers argue that through the FCLAA and the Smokeless Tobacco Act, Congress intended to establish a careful balance between two national interests: (1) educating the public about the use of tobacco products and health and (2) limiting commercial burdens on the tobacco industry. The ingredient reporting and safeguarding provisions, they contend, further these purposes in a unique and exclusive manner. They reason that, while the required ingredient lists allow Congress, with the assistance of the Department of Health and Human Services ("HHS") and its research efforts, to determine the continued adequacy of the mandated warning labels, nonetheless the information provided is kept in strict confidence through elaborate statutory protections. These comprehensive provisions, the manufacturers claim, limit the impact upon commerce associated with reporting and evaluating ingredient information.
 
 
 100
 The manufacturers assert that, by prescribing both an anonymous form of ingredient disclosure and strict safekeeping of the information provided, Congress intended to avoid "unnecessary invasion of company-specific and brand-specific trade secret information." They contend that Congress could have required full ingredient disclosure on all product labels, or, at the other extreme, no disclosure whatever. Instead, it chose a specific intermediate position which represents a "precisely calibrated balance" that, in Congress' judgment, best served the public.
 
 
 101
 The manufacturers further contend that the anonymity provided them when submitting the ingredient lists indicates that the additional provisions protecting the confidentiality of the collected information are not merely matters of "custody" or "internal housekeeping." While conceding that the federal statutes do not grant the information "trade secret status" per se, the manufacturers nonetheless argue that, for preemption purposes, the exacting confidentiality provisions reflect Congress' concern for the potential loss of commercial advantage, which itself is part and parcel of Congress' broader intent to protect commerce and the national economy.
 
 
 102
 According to the manufacturers, enforcement of the Disclosure Act's obligations to disclose brand-specific and company-specific ingredient information, without guarantees of confidentiality, would frustrate the purposes of the FCLAA and Smokeless Tobacco Act. They contend that the federal statutes' intricate information-safekeeping provisions "would be utterly pointless" if a state were permitted to make publicly available information that the federal government may not even collect, much less reveal. Moreover, they claim, it would be "absurd" for the HHS Secretary to continue to collect the federally prescribed ingredient information when even more precise, brand specific information collected pursuant to the Disclosure Act would be readily available. Because Congress carefully limited the collection and disclosure of cigarette ingredients in furtherance of the balance between health education and trade protection, they argue, collection and disclosure of the type contemplated by the Disclosure Act would "stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). They further assert that the comprehensive manner in which Congress dealt with the health concern posed by tobacco-product additives shows its intent to obtain uniformity in ingredient disclosure requirements, supplanting any supplemental state efforts, such as the Disclosure Act, in the area.
 
 
 103
 The manufacturers also offer a closely related argument: the Disclosure Act intrudes into a "field," albeit a narrow one, that Congress intended federal law to occupy exclusively. To this end, they assert that the HHS Secretary's role to review cigarette ingredients from a health standpoint, the stringent confidentiality procedures, and the balance of national interests "evince Congress' intent to occupy the field of cigarette ingredient reporting, monitoring and review." In sum, they argue that the very comprehensiveness, complexity, and specificity of the federal reporting provisions evince a federal dominance and pervasiveness in ingredient reporting and disclosure that allows no room for supplemental state laws such as the Disclosure Act. Ultimately, we find the manufacturers' arguments unpersuasive.
 
 3. Actual Conflict
 
 104
 Topics that warrant congressional legislation necessarily entail issues of national concern. See English v. General Elec. Co., 496 U.S. 72, 87, 110 S.Ct. 2270, 2279-80, 110 L.Ed.2d 65 (1990); Hillsborough County v. Automated Medical Laboratories, Inc., 471 U.S. 707, 719, 105 S.Ct. 2371, 2378, 85 L.Ed.2d 714 (1985). "That cannot mean, however, that every federal statute ousts all related state law." Hillsborough County, 471 U.S. at 719, 105 S.Ct. at 2378. Moreover, the mere fact that a subject of federal legislation requires an "intricate and complex response[ ] from the Congress" does not necessarily indicate that Congress intended its response to be the exclusive means of addressing the issue. Id. at 719, 105 S.Ct. at 2378 (quoting New York State Dept. of Social Services v. Dublino, 413 U.S. 405, 415, 93 S.Ct. 2507, 2514, 37 L.Ed.2d 688); see also Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 143, 111 S.Ct. 478, 485, 112 L.Ed.2d 474 (1990). Rather, "we must look for special features warranting preemption." Hillsborough County, 471 U.S. at 719, 105 S.Ct. at 2378 (involving field-occupation preemption issues), quoted in English, 496 U.S. at 87, 110 S.Ct. at 2279-80 (involving conflict preemption issues); see Ingersoll-Rand Co., 498 U.S. at 144, 111 S.Ct. at 485 (finding that exclusive federal remedy "is precisely the kind of special feature that warrants pre-emption" (internal quotation marks, alterations, and citations omitted)). The manufacturers' implied preemption arguments essentially identify into two purported "special features" in the federal statutes warranting preemption: (1) an asserted "balance of national interests" effected by the FCLAA and Smokeless Tobacco Act, and (2) the detailed and stringent statutory provisions for confidential reporting and protection of ingredient information.a. Balance of National Interests?
 
 
 105
 As indicated above, the FCLAA contains explicit language setting forth its policy and purpose:
 
 
 106
 It is the policy of the Congress, and the purpose of this chapter, to establish a comprehensive Federal program to deal with cigarette labeling and advertising with respect to any relationship between smoking and health, whereby--
 
 
 107
 (1) the public may be adequately informed about any adverse health effects of cigarette smoking by inclusion of warning notices on each package of cigarettes; and
 
 
 108
 (2) commerce and the national economy may be (A) protected to the maximum extent consistent with this declared policy and (B) not impeded by diverse, nonuniform, and confusing cigarette labeling and advertising regulations with respect to any relationship between smoking and health.
 
 15 U.S.C. § 1331.[31]
 
 109
 The manufacturers' implied preemption arguments rely heavily on select phrases from § 1331 and on certain language in our pre-Cipollone decision, Palmer v. Liggett Group, Inc., in which we held that the FCLAA impliedly preempted state common-law causes of action based on failure-to-warn theories. See 825 F.2d at 626. In Palmer, we expansively interpreted § 1331 and declared that, in passing the FCLAA, Congress sought "to strike a fair, effective balance between ... two competing interests": "health protection (through education) and trade protection." Id. at 626. We observed, "Congress ran a hard-fought, bitterly partisan battle in striking the compromise that became the [FCLAA]. It is inconceivable that Congress intended to have that carefully wrought balance of national interests superseded by the views of a single state...." Id. We further quoted favorably the Third Circuit's assertion in Cipollone, prior to Supreme Court review, that the FCLAA " 'presents a carefully drawn balance between the purposes of warning the public of the hazards of cigarette smoking and protecting the interests of [the] national economy.' " Id. (quoting Cipollone v. Liggett Group, Inc., 789 F.2d 181, 187 (3d Cir.1986)) (alteration ours). It now appears, however, that in Palmer we overstated Congress' purposes evinced in § 1331.
 
 
 110
 On review of the Third Circuit's Cipollone opinions,[32] the Supreme Court acknowledged the § 1331-based "protection of national economy" theory, quoting the same phrase we quoted in Palmer when reviewing the prior proceedings of the case. See Cipollone, 505 U.S. at 511, 112 S.Ct. at 2614-15.[33] None of the court's opinions, however, either affirmed or elaborated upon this theory. Rather, a majority of the Court agreed that the two purposes expressed in § 1331 were "(1) adequately informing the public [of any adverse health effects of smoking[34]], and (2) protecting the national economy from the burden imposed by diverse, nonuniform, and confusing cigarette labeling and advertising regulations." 505 U.S. at 514, 112 S.Ct. at 2616 (emphasis added). Therefore, when faced squarely with the opportunity, the majority recognized neither a statutory purpose to protect the tobacco industry from all state-imposed commercial burdens, nor some overarching "balance" from which an expansive domain of preemption might flow.[35]
 
 
 111
 The Court's evident rejection of the lower court's "balance of national interests theory" is reflected in the Court's refusal to engage in an implied preemption analysis even as to those claims not expressly preempted. Had the Court been inclined to recognize and give preemptive effect to the asserted balance, it might have found preempted the surviving failure-to-warn and fraudulent misrepresentation claims which, if successful, would certainly inflict a burden upon the tobacco trade. Instead, the Court recognized the limited purpose of avoiding the burden on the national economy specifically posed by nonuniform labeling and advertising regulations.[36] Moreover, the Court indicated that Congress addressed this concern largely, if not solely, through the express preemption clause, which we have addressed above. See Cipollone, 505 U.S. at 514, 112 S.Ct. at 2616; see also S.Rep. No. 91-566, 1970 U.S.C.C.A.N. at 2663 (explaining that preemption clause was necessary "to avoid the chaos created by a multiplicity of conflicting [cigarette advertising] regulations").
 
 
 112
 We cannot ignore the Cipollone majority's reading of the congressional purpose evinced in § 1331, which is considerably more limited than our enunciation in Palmer and the manufacturers' current contentions. Given the Court's narrower interpretation, we conclude that the Disclosure Act does not impede either purpose expressed in § 1331 because it neither obstructs the congressionally mandated warning labels, nor (for the reasons expressed previously) impedes the national economy by imposing a diverse or nonuniform advertising regulation. Although § 1331 may express some general concern for protecting commerce and the national economy, we will not find preemption where a state law merely creates some general tension with a federal law's abstract objectives. See Commonwealth Edison Co. v. Montana, 453 U.S. 609, 633-34, 101 S.Ct. 2946, 2961-62, 69 L.Ed.2d 884 (1981) (finding no "congressional intent to pre-empt all state legislation that may have an adverse impact on the use of coal" despite general national policy to encourage use of coal); Laurence H. Tribe, American Constitutional Law § 6-26, p. 487-88 (2d ed.) (1988). Indeed, had Congress intended to protect the tobacco industry from negative state action generally, then surviving police regulations, such as prohibitions on smoking in public buildings or on tobacco use by minors, or state taxation, would also be preempted. See S. Rep. 91-566, 1970 U.S.C.C.A.N. at 2663.
 
 
 113
 Having found that the purported general national policy does not yield a special statutory feature that warrants preemption, we turn to specific statutory provisions with which the Disclosure Act allegedly conflicts. Cf. Montana, 453 U.S. at 634, 101 S.Ct. at 2962.
 
 
 114
 b. Conflict with Federal Reporting Provisions?
 
 
 115
 The manufacturers contend that the Disclosure Act conflicts with, and effectively "repeals," Congress' carefully wrought ingredient reporting scheme. They argue that the federal anonymity and confidentiality protections show congressional intent to oust state laws such as the Disclosure Act, which demand product-specific and brand-specific information without protection of confidentiality. Normally, however, state laws are not preempted " 'solely because they impose liability over and above that authorized by federal law.' " English, 496 U.S. at 89, 110 S.Ct. at 2280 (quoting California v. ARC Am. Corp., 490 U.S. 93, 105, 109 S.Ct. 1661, 1667, 104 L.Ed.2d 86 (1989)). Rather, we must find "some specific suggestion in the text or legislative history" of the allegedly preempting federal law to conclude that Congress intended to preempt additional state liabilities. Id.
 
 
 116
 On their face, the FCLAA and Smokeless Tobacco Act do not protect generally the confidentiality of tobacco-industry ingredient information. Rather, they secure only "information provided to the Secretary under [the reporting provisions]." 15 U.S.C. §§ 1335a(b)(2)(A), 4403(b)(2)(A). By like token, the provisions mandating the Secretary to establish confidentiality procedures, while notable for their specificity, apply only to the information provided to her under the statutes. See §§ 1335a(b)(2)(C), 4403(b)(2)(C). Furthermore, as the manufacturers concede, the statutes do not confer "trade secret" or "confidential" status upon the information, but only "treat[ ]" it as such. Id.
 
 
 117
 While the statutes strictly forbid unauthorized disclosure, the proscriptions govern the conduct of only certain federal officers or employees.[37] For example, the laws bestow upon the collected information the benefit of the trade secrets exemption in the Freedom of Information Act ("FOIA"). See 5 U.S.C. § 552(b)(4). The FOIA, however, by its own terms, applies only to federal executive branch agencies. See 5 U.S.C. §§ 551(1), 552(a). Thus, HHS employees and other federal employees need not make publicly available the collected information under the FOIA, but the exemption would not inhibit the conduct of state agencies possessing such information, which are not governed by the FOIA in the first instance. The FCLAA further indicates Congress' strong intent to ensure the confidentiality of the collected information by incorporation of 18 U.S.C. § 1905, which criminalizes unauthorized disclosure of confidential or trade secret information. Again, section 1905 itself applies only to "an officer or employee of the United States or of any department or agency thereof" and certain other persons not implicated here. Id.
 
 
 118
 Moreover, the legislative histories referencing the reporting provisions make little or no mention of the ancillary confidentiality protections and certainly do not reveal any intent generally to safeguard industry ingredient-information outside of the lists provided to the Secretary. With regard to the reporting provision in the CSEA, House Report 805 accompanying the CSEA explains only that it "would permit the federal government to initiate the toxicologic research necessary to measure any health risk posed by additives and other ingredients to cigarettes during the manufacturing process." H.R.Rep. No. 98-805, at 21, 1984 U.S.C.C.A.N. at 3734. Senate Report 209 accompanying the Smokeless Tobacco Act states only that the provision "is included to further the accumulation of knowledge about the health risks of smokeless tobacco use, particularly the possible hazards of substances added to tobacco to enhance flavor and for other purposes." S.Rep. No. 99-209 at 14, 1986 U.S.C.C.A.N. p. 13. The reports neither discuss nor elaborate upon the purpose of the confidentiality protections.
 
 
 119
 The textual and historical indications lead to the conclusion that Congress primarily intended the reporting provisions in the FCLAA and Smokeless Tobacco Act to further toxicological research. By "treat[ing]" the collected information as a "trade secret" or "confidential," the statutes further the primary research objective in a meaningful, but limited, way: facilitating ready access to the ingredient information required for research purposes by assuring the tobacco industry that any trade secret interests in the information provided to the Secretary will be safeguarded.[38] In our view, the fact that Congress took great care to safeguard reported ingredient information at most indicates that Congress presumed the information's confidential nature for the purposes of its regime. Perhaps Congress even assumed that there was no question as to the trade secret status of the ingredient information. Underlying assumptions, however, do not merit preemptive force; legislative enactments do. Our review of the statutory text and legislative history does not yield the requisite clear and manifest congressional intent to speak nationally and finally on the general confidential status of tobacco-product ingredients.[39]
 
 
 120
 Thus, while Congress proceeded expeditiously with its health research objectives by treating the ingredient information as a trade secret, it did not thereby preempt States from otherwise lawfully obtaining (or attempting to obtain) such information. Moreover, that Congress did not intend through the FCLAA and Smokeless Tobacco Act nationally to protect all tobacco-product ingredients information does not necessarily force the manufacturers to reveal their purported trade secrets. The manufacturers may well have valid trade secret interests that are threatened by the Disclosure Act. The actual merit of any trade secret claim, however, is not before us now, and we are not at liberty to speculate as to the resolution of the issue.[40] Cf. CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 673 n. 12, 113 S.Ct. 1732, 1742 n. 12, 123 L.Ed.2d 387 (1993) (after finding no preemption, refusing to speculate as to outcome of state law action).
 
 
 121
 The manufacturers insist that enforcement of the Disclosure Act will circumvent or otherwise nullify federal law because it potentially allows widespread access to information that, when in the federal government's hands, would not be publicly available. Having found, however, that national trade-secret protection of ingredient information is neither a feature nor an objective of the statutes, the state law does not "nullify" the federal confidentiality protections because the information submitted under the federal regime itself is not affected by it. In other words, enforcement of the Disclosure Act neither directly nor indirectly allows access to the information in the HHS's possession. Moreover, because the Disclosure Act leaves completely unaffected the requirements, procedures, and programs of the FCLAA and Smokeless Tobacco Act, it does not interfere with the methods by which Congress sought to reach its research and public-education goals. Cf. Ouellette, 479 U.S. at 494, 107 S.Ct. at 813 (finding preempted state common-law water pollution action which would impermissibly circumvent the Clear Water Act's permit system, the method by which federal statute was designed to eliminate water pollution); Wood v. General Motors Corp., 865 F.2d 395, 412 (1st Cir.1988) (finding preempted negligence lawsuit for failure to install automobile air bag where claim would interfere with Congress' scheme to subordinate the states' role in establishing safety standards where pertinent federal standard exists).
 
 
 122
 The manufacturers seek solace in Hyde Park Partners v. Connolly, 839 F.2d 837 (1st Cir.1988), involving the preemptive effect of the Williams Act, the sole purpose of which is "the protection of investors confronted with a tender offer." Id. at 849. The Williams Act requires takeover bidders to disclose their acquisition of a 5% stake in a corporation within ten days after the acquisition, id. at 851, whereas the state law at issue penalized takeover bidders who failed to disclose their intent before acquiring a 5% stake, id. at 840. We explained that the Williams Act struck a temporal balance "to provide shareholders with the best of both worlds--disclosure substantial enough and early enough to ensure fully informed choices, but not so early that those choices will be unduly restricted by the chilling effect on takeover bids." Id. at 852. We held that the state law, which would likely "discourage takeover attempts to a much greater extent than that envisioned by Congress" to the detriment of investors, would intrude upon the federal law's careful "point of equipoise" and defeat the law's "essential purpose." Id.
 
 
 123
 The manufacturers contend that, here, Congress carefully chose a "point of equipoise" between ingredient reporting and confidentiality, which the Disclosure Act impermissibly alters. We disagree. First, unlike the temporal public-disclosure balance in Hyde Park, the purported "point of equipoise" itself is not directly disturbed because the Disclosure Act has no effect on the federal laws' collection and safeguarding efforts with respect to the information provided to the Secretary. Second, even assuming the state law somehow altered the purported balance, "[u]nder Hyde Park, the question is not whether a congressionally calibrated system is altered by state law, but if altered, whether the change obstructs the purpose of Congress." Associated Indus. of Mass. v. Snow, 898 F.2d 274, 282 (1st Cir.1990) (emphasis added). Here, the controlling purpose of the reporting provisions, which the confidentiality provisions further, is to permit toxicological research to determine the health risks of additives. See H.R.Rep. No. 98-805, at 21, 1984 U.S.C.C.A.N. at 3734; S.Rep. No. 99-209 at 14, 1986 U.S.C.C.A.N. p. 13. Any alterations to the "balance" between reporting and confidentiality posed by the Disclosure Act would not frustrate this purpose. Rather, if the manufacturers' trade secret and other claims ultimately fail and the ingredient information that the Disclosure Act mandates becomes public knowledge, the state law arguably would further Congress' purpose.
 
 
 124
 Finally, we find no evidence that Congress intended to effect national "uniformity" in ingredient reporting and disclosure regulations.[41] In Wood, both the statutory language and legislative history indicated Congress' intent to effect uniform federal motor-vehicle safety standards throughout the country. See 865 F.2d at 412; see also Rini v. United Van Lines, Inc., 104 F.3d 502, 504 (1st Cir.1997) (explaining that "the principal purpose of the [Carmack] Amendment was to achieve national uniformity in the liability assigned to carriers"), petition for cert. filed, 65 U.S.L.W. 3768 (U.S. Mar. 28, 1997) (No. 96-1800). In this case, while the statutory language and legislative history show that Congress plainly intended to effect uniform labeling and warning requirements, see 15 U.S.C. §§ 1331, 1333, 1334, 4402, 4406(b), no such intent regarding ingredient disclosure is apparent. Had Congress desired similar uniformity in reporting and disclosure efforts, it plainly knew how to accomplish that end. The fact remains, however, that it did not.
 
 
 125
 In sum, the reporting provisions protect only the particular information provided to the HHS while in the hands of HHS employees, and only from disclosure by HHS or certain federal government employees. Congress considered the submission of aggregate and anonymous ingredient information sufficient for its research purposes, and, to be sure, intended to safeguard the confidentiality of the information once provided. Although Congress apparently accepted any claim to the trade secret status of tobacco industry ingredient-information, it did not intend to immunize manufacturers nationally from any additional reporting or disclosure requirements, or to prevent the public from becoming aware of such information other than that particularly provided to the HHS under the federal schemes. While enforcement of the Disclosure Act may ultimately make the confidentiality protections somewhat redundant, it does not frustrate the controlling congressional purpose to initiate toxicological research on the effects of tobacco-product additives. In light of the strong presumption against preemption of state health-and-safety regulations that governs our analysis, we find that the federal statutes' provisions to protect the confidentiality of tobacco-product ingredient information do not constitute a "special feature" overcoming that presumption. See English, 496 U.S. at 72, 110 S.Ct. at 2271; Snow, 898 F.2d at 282.
 
 4. Field Occupation
 
 126
 Having found no actual conflict between the federal laws and the Disclosure Act, we turn to the argument that the Disclosure Act nonetheless treads upon an exclusive federal regulatory domain. " 'Where ... the field which Congress is said to have pre-empted' includes areas that have 'been traditionally occupied by the states,' congressional intent to supersede state laws must be ' "clear and manifest." ' " English, 496 U.S. at 79, 110 S.Ct. at 2275 (quoting Jones v. Rath Packing Co., 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977)) (in turn quoting Rice v. Santa Fe Elevator Corp., 331 U.S. at 230, 67 S.Ct. at 1152).
 
 
 127
 It is evident that the FCLAA and Smokeless Tobacco Act preempt state regulation in the area of tobacco-product labeling and warnings. The statutes do not purport, however, to regulate exclusively all other aspects of tobacco-product use or sales.[42] While the reporting provisions address ingredient collection and safekeeping "in considerable detail," id., those provisions simply further the statutory goal of toxicological research on the part of HHS, with a view toward potential additional federal regulatory action. Although the federal scheme is in some respects comprehensive, it is not " 'so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it.' " Mortier, 501 U.S. at 613, 111 S.Ct. at 2486 (quoting Rice, 331 U.S. at 230, 67 S.Ct. at 1152). See id. (explaining that while Federal Insecticide, Fungicide, and Rodenticide Act had evolved into a "comprehensive regulatory statute," it contains "ample room" for supplemental state efforts); Tart v. Massachusetts, 949 F.2d 490, 501 (1st Cir.1991) (preserving state law prohibition on permitless landing of raw fish in state because federal fishing licensing statute, which authorizes the navigation and taking of fish from state territorial waters, does not "occupy the field" of coastal fishing).
 
 
 128
 Nor can the manufacturers maintain that the Disclosure Act treads upon the preempted domain of labeling and advertising. On this point, the Court's analysis in English is instructive. In English, respondent argued that a federal provision forbidding retaliation for making a nuclear-safety complaint was an integral part of the preempted field of nuclear safety, and thus, state law remedies for conduct covered under the federal retaliation provision were preempted. See 496 U.S. at 82, 110 S.Ct. at 2277. The Court disagreed, acknowledging that while the federal provision "obviously bears some relation to the field of nuclear safety, its 'paramount' purpose was the protection of employees." Id. at 83, 110 S.Ct. at 2277. Moreover, while the state law "in some remote way may [have] affect[ed] ... nuclear safety decisions made by those who build and run nuclear facilities," it did not fall within the preempted realm because it did not have a "direct and substantial effect" on the decisionmakers. Id. at 85, 110 S.Ct. at 2278.
 
 
 129
 Here, while the federal reporting provisions bear some relation to the field of labeling and advertising, their "paramount purpose" is to initiate toxicological research into the health hazards posed by additives. It would be speculative, at best, to envision how the manufacturers' reporting obligations to the Massachusetts Department of Public Health under the Disclosure Act might have a remote effect, much less a direct and substantial one, on federal efforts in the area of labeling and advertising. Cf. Schneidewind, 485 U.S. at 308, 108 S.Ct. at 1155 ("Of course, every state statute that has some indirect effect on [a preempted realm] is not pre-empted.").
 
 
 130
 Thus, we find no indication in the federal statutes that Congress intended to supplant any and all state involvement in the area of tobacco-product ingredient collecting, monitoring, and review. In the absence of such indication, the mere detail by which the statutes collect and safeguard ingredient information is insufficient to establish a "clear and manifest" intent on the part of Congress to supersede state laws, English, 496 U.S. at 79, 110 S.Ct. at 2275, or otherwise overcome the presumption against preemption, see Hillsborough County, 471 U.S. at 715, 105 S.Ct. at 2376. "Given this statutory scheme, it is for Congress to rethink the division of regulatory authority in light of its possible exercise by the States to undercut a federal objective." Pacific Gas & Electric v. Energy Resources Comm'n, 461 U.S. 190, 223, 103 S.Ct. 1713, 1732, 75 L.Ed.2d 752 (1983).[43]
 
 V.
 Conclusion
 
 131
 Although Congress sought through the FCLAA and the Smokeless Tobacco Act to achieve several goals on the subject of tobacco-product use and health, preventing states from obtaining information regarding product additives and disclosing such information to the public was not one of them. Congress is free, of course, to enact legislation to bar the operation of laws such as the Disclosure Act. We are satisfied, however, that it has not done so yet, and "[t]he courts should not assume the role which our system assigns to Congress." Pacific Gas & Electric, 461 U.S. at 223, 103 S.Ct. at 1732.
 
 
 132
 For the foregoing reasons, we affirm the district court's ruling that the Massachusetts Disclosure Act survives the manufacturers preemption challenge. Costs to Appellees.
 
 ATTACHMENT
 Appendix A
 
 133
 In its entirety, the Massachusetts Disclosure Act provides:
 
 
 134
 § 307B. Manufacture of tobacco products; annual reports including added constituents and nicotine yield ratings; disclosure; exclusions
 
 
 135
 For the purpose of protecting the public health, any manufacturer of cigarettes, snuff or chewing tobacco sold in the commonwealth shall provide the department of public health with an annual report, in a form and at a time specified by that department, which lists for each brand of such product sold the following information:
 
 
 136
 (a) The identity of any added constituent other than tobacco, water or reconstituted tobacco sheet made wholly from tobacco, to be listed in descending order according to weight, measure, or numerical count; and
 
 
 137
 (b) The nicotine yield ratings, which shall accurately predict nicotine intake for average consumers, based on standards to be established by the department of public health.
 
 
 138
 The nicotine yield ratings so provided, and any other such information in the annual reports with respect to which the department determines that there is a reasonable scientific basis for concluding that the availability of such information could reduce risks to public health, shall be public records; provided, however, that before any public disclosure of such information the department shall request the advice of the attorney general whether such disclosure would constitute an unconstitutional taking of property, and shall not disclose such information unless and until the attorney general advises that such disclosure would not constitute an unconstitutional taking.
 
 
 139
 This section shall not require a manufacturer, in its report to the department or otherwise, to identify or disclose the specific amount of any ingredient that has been approved by the Food and Drug Administration, Public Health Service, United States Department of Health and Human Services ("FDA"), or its successor agency, as safe when burned and inhaled or that has been designated by the FDA, or its successor agency, as generally recognized as safe when burned and inhaled, according to the Generally Recognized As Safe list of the FDA.
 
 
 140
 Mass. Gen. Laws ch. 94, § 307B.
 
 
 
 [1]
 The specific plaintiffs-appellants are Philip Morris Incorporated, R.J. Reynolds Tobacco Company, Brown & Williamson Tobacco Corporation, and Lorillard Tobacco Company ("the cigarette manufacturers") [case no. 97-8022], and United States Tobacco Company, Brown & Williamson Tobacco Corporation, Conwood Company, L.P., National Tobacco Company, L.P., The Pinkerton Tobacco Company, and Swisher International, Inc. ("the smokeless tobacco manufacturers") [case no. 97-8023]
 
 
 [2]
 The specific defendants-appellees are L. Scott Harshbarger, Attorney General of the Commonwealth of Massachusetts, and David H. Mulligan, Massachusetts Commissioner of Public Health
 
 
 [3]
 Because of the Disclosure Act's extended effective date, now November 1, 1997, the district court deferred consideration of the manufacturers' contemporaneously filed preliminary injunction motion
 
 
 [4]
 When reviewing a district court's ruling on cross-motions for summary judgment, normally we consider the record evidence with respect to each motion separately "to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir.1996). See 10A Charles A. Wright, et al., Federal Practice and Procedure, § 2720 (1983). Here, however, because no underlying issue of material fact exists with respect to the legal preemption issue, we need not consider each motion separately
 
 
 [5]
 See Appendix A for the full text of the Disclosure Act, Mass. Gen. Laws ch. 94, § 307B
 
 
 [6]
 At the time, the warning was not required in cigarette advertisements
 
 
 [7]
 For example, the Federal Communications Commission announced its intention to consider a proposed rule that would ban radio and television cigarette commercials, while the California Senate "passed a total ban on both print and electronic cigarette advertisements." Cipollone, 505 U.S. at 515 & n. 11, 112 S.Ct. at 2616 & n. 11
 
 
 [8]
 In part because the new preemption provision banned restrictions imposed only "under State law," in 1972 the Federal Trade Commission extended the warning requirements to print advertisements, as well as package labels. See Cipollone, 505 U.S. at 515, 112 S.Ct. at 2617
 
 
 [9]
 Specifically, the new required warnings, all preceded by the phrase "SURGEON GENERAL'S WARNING," are as follows:
 Smoking Causes Lung Cancer, Heart Disease, Emphysema, And May Complicate Pregnancy.
 Quitting Smoking Now Greatly Reduces Serious Risks to Your Health.
 Smoking by Pregnant Women May Result in Fetal Injury, Premature Birth, and Low Birth Weight.
 Cigarette Smoke Contains Carbon Monoxide.
 15 U.S.C. § 1333(a).
 
 
 [10]
 The legislative history indicates that the ingredient reporting provision was intended to supply statutory authority to require the manufacturers to disclose such information and to "supercede, in all respects, a voluntary agreement entered into between the Department of [Health and Human Services] and the tobacco industry in June, 1982." H.R.Rep. No. 98-805, at 21, 1984 U.S.C.C.A.N. at 3734. The House Report further explains that the provisions "would permit the federal government to initiate the toxicologic research necessary to measure any health risk posed by the addition of additives and other ingredients to cigarettes during the manufacturing process." Id
 
 
 [11]
 The extent to which members of Congress are bound, if at all, by the disclosure prohibitions is unclear
 
 
 [12]
 It appears, however, that the Secretary's efforts to notify the "person who provided the list" may be made more difficult by § 1335a(a)'s option for such persons to provide the list anonymously through a third individual or entity
 
 
 [13]
 In addition to amending the FCLAA, the CSEA also directed the Secretary to "establish and carry out a program to inform the public of any dangers to human health presented by cigarette smoking." 15 U.S.C. § 1341. Pursuant to that program, the Secretary must, inter alia, coordinate research on smoking and health and disseminate pertinent information to the public. See id. at § 1341(a). To carry out some of the program's purposes, the CSEA established an Interagency Committee on Smoking and Health. See id. at § 1341(b). The Secretary also must transmit specified reports to Congress regarding efforts made to inform the public of the health hazards of smoking and other information. See id. at § 1341(c)
 
 
 [14]
 The specific texts of the alternative warnings, all preceded by the word "WARNING," read:
 THIS PRODUCT MAY CAUSE MOUTH CANCER.
 THIS PRODUCT MAY CAUSE GUM DISEASE AND TOOTH LOSS.
 THIS PRODUCT IS NOT A SAFE ALTERNATIVE TO CIGARETTES.
 15 U.S.C. § 4402(a)(1).
 
 
 [15]
 Additionally, the Smokeless Tobacco Act specifically precludes any federal agency from requiring any such statements. See 15 U.S.C. § 4406(a)
 
 
 [16]
 Senate Report 209 explains that "the Committee [on Labor and Human Resources] wants to emphasize that by including provisions in [the Act] which require health warnings on packages and advertisements for smokeless tobacco products, and by preempting State and local laws requiring additional health warnings, it does not intend to preempt a State's ability to control the promotion or advertising of tobacco products and does not intend to preempt product liability suits in State or Federal courts based on failure to warn." S.Rep. No. 99-209, at 14, 1986 U.S.C.C.A.N. at 13
 
 
 [17]
 According to the Senate Report, the Smokeless Act's ingredient reporting provision is "very similar" to that in the CSEA and "is included to further the accumulation of knowledge about the health risks of smokeless tobacco use, particularly the possible hazards of substances added to tobacco to enhance flavor and for other purposes." S.Rep. No. 99-209, at 14, 1986 U.S.C.C.A.N. at 13
 
 
 [18]
 The preemption framework described, while providing a useful backdrop for our analysis, does not reflect "rigidly distinct" preemption categories. English, 496 U.S. at 79 n. 5, 110 S.Ct. at 2275 n. 5. For example, "field pre-emption may be understood as a species of conflict pre-emption: A state law that falls within a pre-empted field conflicts with Congress' intent (either express or plainly implied) to exclude state regulation." Id. See also Hines, 312 U.S. at 67, 61 S.Ct. at 404 (stating that "none of these expressions provides an infallible constitutional test or an exclusive constitutional yardstick"); Palmer, 825 F.2d 620, 625-26 (describing preemption labels as "[not] necessarily helpful" and looking to Congress' intent and the effect of state law on the federal scheme)
 
 
 [19]
 In Cipollone, a majority of the Supreme Court employed the presumption in analyzing and construing the 1965 Act's express preemption provision. See 505 U.S. at 518, 112 S.Ct. at 2618. In Wilson v. Bradlees of New Eng., 96 F.3d 552, 557 (1st Cir.1996), cert. denied, --- U.S. ----, 117 S.Ct. 1083, 137 L.Ed.2d 218 (1997), however, we questioned the force of the presumption "in the construction of express preemption clauses" in view of the Justices' apparently differing opinions on the subject in its post-Cipollone decision, Medtronic v. Lohr Compare --- U.S. at ----, 116 S.Ct. at 2250 (plurality confirming the presumption as "consistent with both federalism concerns and the historic primacy of state regulation of matters of health and safety"); with id. at ----, 116 S.Ct. at 2263 (four Justices, concurring in part and dissenting in part, employing an analysis suggesting that normal statutory construction principles apply when construing express preemption clause). Just last Term, however, the Supreme Court reaffirmed the applicability of the presumption in interpreting even an expansive preemption clause. See California Labor Stds. Enforcement v. Dillingham Constr., --- U.S. ----, ----, ----, 117 S.Ct. 832, 838, 842, 136 L.Ed.2d 791 (1997) (unanimous decision) (applying presumption in interpretation of broad preemption language in the Employee Retirement Income Security Act of 1974)
 
 
 [20]
 We acknowledge that the Cipollone plurality's "narrow" reading of the preemption provision is not without disagreement by other members of the Court. See 505 U.S. at 544, 112 S.Ct. at 2632 (Scalia, J., concurring in part, dissenting in part) (stating that preemption analysis requires the Court "to interpret Congress's decrees of pre-emption neither narrowly nor broadly, but in accordance with their apparent meaning"); see also id. at 545, 548, 112 S.Ct. at 2632, 2634 (Scalia, J., concurring in part, dissenting in part) (explaining that, given the express preemption provision, "our responsibility is to apply to the text ordinary principles of statutory construction.... When [the ordinary meaning of the statute's language] suggests that the pre-emption provision was intended to sweep broadly, our construction must sweep broadly as well.... And when it bespeaks a narrow scope of pre-emption, so must our judgment." (citation omitted)); cf. Laurence H. Tribe, American Constitutional Law § 6-29, p. 510 (2d ed.) (1988) (indicating that preemption analysis should be approached as "a matter of statutory construction rather than free-form judicial policymaking")
 
 
 [21]
 It is undisputed that the cigarette manufacturers' cigarette packages are properly labeled under the FCLAA
 
 
 [22]
 The Disclosure Act constitutes a "requirement" because unless tobacco product manufacturers comply with its reporting provisions, they must forgo selling their products in Massachusetts. Cf. Vango Media, Inc. v. City of New York, 34 F.3d 68, 72 (2d Cir.1994) (finding city ordinance pertaining to tobacco product advertisements "plainly is a 'requirement' " within the meaning of § 1334(b) because absent compliance with the ordinance, plaintiff would have to forgo advertising display)
 
 
 [23]
 In reviewing the FCLAA as a whole, see Crandon v. United States, 494 U.S. 152, 158, 110 S.Ct. 997, 1001-02, 108 L.Ed.2d 132 (1990), we observe that the specific references to the words "advertising," "advertisement," and the phrase "advertising or promotion," in context, suggest an interpretation of those concepts significantly more traditional than furnishing ingredient and nicotine-yield reports to a state agency. See, e.g., § 1331(1) (referring to the "inclusion of warning notices on each package ... and in each advertisement of cigarettes" (emphasis added)); § 1333(a)(2) ("It shall be unlawful for any manufacturer ... of cigarettes to advertise or cause to be advertised ... any cigarette unless the advertising bears [a required label]") (emphasis added); § 1333(a)(3) (involving similar requirement for outdoor billboard advertisements); § 1335 (making it illegal for manufacturers "to advertise" on radio and television); § 1336 (acknowledging the Federal Trade Commission's authority in the area of unfair practices "in the advertising of cigarettes") (emphasis added); § 1337 (requiring the FTC to transmit annual reports to Congress "concerning ... current practices and methods of cigarette advertising and promotion ") (emphasis added)
 
 
 [24]
 Justice Blackmun's concurring and dissenting opinion, joined by two other Justices, expressed the view that the 1969 Act's preemption clause did not reach state common law claims at all. Thus, these three Justices expressed no view on the meaning of the phrase at issue here
 
 
 [25]
 Noting that manufacturers normally communicate required product warnings through advertising and promotion, Justice Scalia found it "implausible that Congress meant to save cigarette companies from being compelled to convey such data to consumers through that means, only to allow them to be compelled to do so through means more onerous still." Cipollone, 505 U.S. at 555, 112 S.Ct. at 2637 (Scalia, J., concurring in part, dissenting in part)
 
 
 [26]
 The Lacey court acknowledged the Cipollone plurality's suggestion that the FCLAA would not preempt a state law requirement to disclose smoking-and-health facts to an administrative agency. See 956 F.Supp. at 962. The court explained, however, that the law of the pertinent state (Alabama) imposed no such obligation. See id
 
 
 [27]
 See Penn Advertising v. Mayor of Baltimore, 63 F.3d 1318, 1320-21, 1324 (4th Cir.1995) (holding that FCLAA did not preempt city ordinance prohibiting placement of certain forms of cigarette advertisements in publicly visible places because the ordinance merely limited the location, and did not address the content, of cigarette advertisements), vacated and remanded on other grounds, --- U.S. ----, 116 S.Ct. 2575, 135 L.Ed.2d 1090 (1996), modified by 101 F.3d 332 (4th Cir.1996), cert. denied, --- U.S. ----, 117 S.Ct. 1569, 137 L.Ed.2d 715 (1997); see also id. at 1324 (noting Cipollone plurality's declination to focus on whether a claim contests the "propriety" of advertising or promotion)
 
 
 [28]
 The manufacturers do not argue that the 1984 amendments to the FCLAA wrought by the CSEA in any manner changed or affected the meaning of the express preemption clause, last amended in 1969. Thus, we do not address the question whether the ingredient reporting requirements or other amendments affect the express preemption analysis
 
 
 [29]
 For the reasons stated in our FCLAA express preemption analysis, we reject the manufacturers' argument that the publicizing of the ingredient lists effectively transforms the lists into an "advertisement" within the meaning of § 4406(b)
 
 
 [30]
 The FCLAA additionally makes such disclosure a felony by explicit reference to 18 U.S.C. § 1905, which criminalizes unauthorized disclosure of trade secret or confidential information by federal officers or employees. See 15 U.S.C. § 1335a(b)(2)(A)
 
 
 [31]
 Although the Smokeless Tobacco Act does not contain a § 1331 counterpart, the smokeless tobacco manufacturers seek to avail themselves of arguments related to this section because of the similar substantive provisions in the two statutes. Because a statute's substantive provisions carry out its purpose, they argue, Congress must have intended the same polices and purposes to animate the two statutes. For the sake of argument, we accept their contention that the same pertinent purposes animate the two statutes
 
 
 [32]
 The Third Circuit produced a number of published opinions for the Cipollone case. Although the Supreme Court discussed the Court of Appeals' opinion published at 789 F.2d 181 (1986), it accepted review of the case published at 893 F.2d 541 (1990)
 
 
 [33]
 The Court also cited Palmer as an example of a case following the Third Circuit's analysis in Cipollone, 789 F.2d 181. See Cipollone, 505 U.S. at 508 n. 2, 112 S.Ct. at 2613 n. 2
 
 
 [34]
 We modify the Court's language here in light of the 1984 amendment to § 1331(1) reflecting the new rotating warning system
 
 
 [35]
 As indicated earlier, the Cipollone Court did not address the CSEA and its amendments to the FCLAA. We see no reason, however, why the CSEA would change the Court's interpretation of the text of § 1331(2), which has never been amended, regarding the nature of the burden to the national economy sought to be avoided under the FCLAA. While the CSEA necessarily furthers the congressional purposes expressed in § 1331, nothing in the 1984 amendments suggests that it alters the scope of the protected interest expressed in § 1331(2), as interpreted by the Court in Cipollone
 
 
 [36]
 At this point, we will not speculate as to the nature and character of the burden created should other states impose differing reporting requirements. See English 496 U.S. at 90, 110 S.Ct. at 2281 (finding certain imagined prospects "simply too speculative a basis on which to rest a finding of pre-emption"). Although the cigarette manufacturers cite dozens of pending tobacco-disclosure bills in state legislatures, even if we assume the bills will become law, see Minn. H.F. 117 § 5, the resulting burden is qualitatively different, and seemingly significantly lesser, than that created by varying warning requirements in the production of labels and advertising for each product and brand
 
 
 [37]
 The proscriptions against disclosure are subject to any request by a congressional committee or subcommittee. See 15 U.S.C. §§ 1335a(b)(2)(B), 4403(b)(2)(B)
 
 
 [38]
 Furthermore, the mere fact that Congress found an aggregate form of ingredients disclosure sufficient for its purposes is no indication that increased state requirements would conflict with its own scheme
 
 
 [39]
 We are thus unpersuaded by the manufacturers' citation of isolated bits of hearing testimony referring to the CSEA's protection of "trade secret" ingredient information. See e.g., 130 Cong. Rec. 24,626 (1984). Such statements, while indicative of Congress' intent to protect the presumed confidential status of the information provided to the Secretary, do not reveal a purpose to grant tobacco-product manufacturers nationwide immunity from state attempts to obtain and publicize ingredient information. Cf. Mortier, 501 U.S. at 614-15, 111 S.Ct. at 2486-87 (finding no actual conflict where frustration of purported federal purpose relied on "little more than snippets of legislative history and policy speculations")
 
 
 [40]
 From our review of the manufacturers' complaints, it appears that the merits of any trade secret claims underlie their takings and full faith and credit claims
 
 
 [41]
 We note the observation that a congressional determination to effect a nationally uniform standard presents "a situation similar in practical effect to that of federal occupation of a field." Tribe, supra § 6-26, at 486
 
 
 [42]
 Although the statutes also contain provisions to further health education through research, we find no indication that Congress intended to oust supplemental state efforts in this regard as well
 
 
 [43]
 The cigarette manufacturers also assert that the Disclosure Act is not a matter of "local concern" because it addresses an issue of national significance as to which Massachusetts has no special or unique interest and that, by its very nature, it will necessarily have nationwide impact thereby contradicting a policy decision made for the nation by Congress. To the extent this argument touches upon the "balance of national interests" theory, we have disposed of that above for the purposes of preemption analysis. To the extent the argument touches upon any Commerce Clause claims, see generally Hyde Park, 839 F.2d at 843-48, the issue is not properly before us here