**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOE RIVERA, individually and as
Guardian ad Litem for Joseph
Rivera, V, and Jenica Rivera,
minors, and Joe Rivera as Special
Administrator to the Estate of
Pamela Rivera,
*Plaintiff-Appellant,*

v.

PHILIP MORRIS, INC., a Virginia
corporation,
*Defendant-Appellee.*

No. 03-16100

D.C. No.
CV-01-00601-JCM

OPINION

Appeal from the United States District Court
for the District of Nevada
James C. Mahan, District Judge, Presiding

Argued and Submitted
December 10, 2004—San Francisco, California

Filed January 28, 2005

Before: Jerome Farris, Dorothy W. Nelson, and
Ronald M. Gould, Circuit Judges.

Opinion by Judge Farris

**COUNSEL**

Mark Johnson, Esq. and Sims Weymuller, Esq., Johnson-Flora, PLLC, Seattle, Washington, for the plaintiff-appellant.

John P. Desmond, Esq., Jones Vargas, Reno, Nevada, Daniel P. Collins, Esq., Munger Tolles & Olson, Los Angeles, California, for the defendant-appellee.

**OPINION**

FARRIS, Senior Circuit Judge:

Joe Rivera brought a wrongful death action against Philip Morris Inc., a tobacco manufacturer, asserting state law claims for strict product liability, fraud, and conspiracy. Summary judgment in favor of Philip Morris was granted. We affirm in part and remand for further proceedings.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Facts

Joe Rivera initiated this action individually, as Guardian ad Litem for his children and as executor of his deceased wife's estate. He filed suit in Nevada state court, alleging strict product liability based on theories of failure-to-warn and design-defect, fraud based on theories of both fraudulent concealment and fraudulent misrepresentation, and conspiracy. He contended that his late wife, Pamela Rivera, smoked Marlboro cigarettes manufactured by Philip Morris beginning in the summer of 1969 until her death from lung cancer in 1999.

### B. District Court Proceedings

This action was timely and properly removed from state to federal court under diversity jurisdiction. The district court subsequently granted summary judgment in favor of Philip Morris, on grounds that (1) the strict product liability claim was preempted by the Federal Cigarette Labeling and Advertising Act of 1965, 15 U.S.C. §§ 1331 *et seq.*, or alternatively, as a matter of law, the claim failed under Nevada's common knowledge test; (2) the fraudulent concealment claim was preempted by the same federal statute, or alternatively, evidence was lacking that the decedent would have acted differently if Philip Morris had disclosed material information concerning the health effects of smoking; (3) the fraud claim was not preempted under federal law but evidence was absent that the decedent saw, heard, or read and relied upon any misrepresentation by Philip Morris; and (4) the conspiracy claim necessarily failed because it was a derivative of other underlying claims. Rivera does not appeal the dismissal of his strict liability design-defect claim. He has not presented any argument with regard to the dismissal of his conspiracy claim and has therefore waived that issue on appeal.

## II. DISCUSSION

### A. Standard of Review

We review a grant of summary judgment *de novo*, construing the evidence in the light most favorable to the nonmoving party. *Lindsey v. Tacoma-Pierce County Health Dep't*, 195 F.3d 1065, 1068 (9th Cir. 1999). A grant of summary judgment is appropriate only where the moving party has demonstrated that there is no genuine issue of material fact. *Id*. Material facts are those which might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is genuine if a reasonable trier of fact could find in favor of the nonmoving party. *Id*. Once the moving party demonstrates the absence of a genuine issue of material fact, the nonmoving party that bears the ultimate burden at trial must show that there is evidence creating a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). A mere scintilla of evidence supporting the nonmoving party's position is insufficient; there must be evidence on which a jury could reasonably find for the nonmoving party. *Anderson*, 477 U.S. at 252.

### B. Federal Preemption

**[1]** As a threshold issue, we first determine whether any of Rivera's state law claims are preempted by federal law. Under the Supremacy Clause of the United States Constitution, Congress may preempt state common law as well as state statutory law through federal legislation. U.S. CONST. art VI. § 2; *Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 325-27 (1981). The district court concluded that Rivera's strict liability and fraudulent concealment claims were preempted by the Federal Cigarette Labeling and Advertising Act of 1965, as amended by the Public Health Cigarette Smoking Act of 1969, because both claims necessarily attacked the sufficiency of federally-mandated cigarette health warnings.

In 1965, Congress enacted the Federal Cigarette Labeling and Advertising Act, which required all cigarette packages to contain a warning that smoking was hazardous. The purpose of the Labeling Act was to adequately inform the public of the dangers associated with smoking cigarettes and to protect the national economy from the burden imposed by diverse, non-uniform, and confusing cigarette labeling and advertising regulations. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 514 (1992). A few years later, Congress passed the Public Health Cigarette Smoking Act of 1969, which amended the Labeling Act by including a preemption clause that states: "No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this chapter." 15 U.S.C. § 1334(b).

In *Cipollone*, the Supreme Court addressed preemption as applied to several state common law claims against cigarette manufacturers. In interpreting the preemption provision, a four-member plurality of the Court found that the Labeling Act's broad language preempted some, but not all, common law claims. *Cipollone*, 505 U.S. at 520-21. To determine whether a particular common law claim fell within the express preemption clause, the plurality performed the following "central inquiry": "we ask whether the legal duty that is the predicate of the common-law damages action constitutes a 'requirement or prohibition based on smoking and health . . . imposed under State law with respect to . . . advertising or promotion,' giving that clause a fair but narrow reading." *Id.* at 523-24. Applying this test, four Justices agreed that the Labeling Act preempted the petitioner's failure-to-warn claims "insofar as claims under . . . [a] failure-to-warn theory require a showing that . . . post-1969 advertising or promotions should have included additional, or more clearly stated, warnings . . . ." *Id.*

**[2]** As to the claims before us, a majority of the Court, including two dissenting Justices, agreed that failure-to-warn

claims based on allegations that post-1969 advertising or promotional materials should have included additional, or more clearly stated, warnings are preempted by the Labeling Act. However, a plurality of the Court found that certain claims were not preempted, including (1) failure-to-warn claims based solely on negligent testing, research practices, or other actions unrelated to advertising or promotion, (2) fraudulent concealment claims based on a state-law duty to disclose material facts through channels other than advertising or promotion (e.g., state agency), (3) misrepresentation claims based on false statements of material fact made in advertising, and (4) conspiracy to misrepresent material facts, provided a claim for misrepresentation can be maintained.

## (1)   Strict Liability Failure-to-Warn Claim

The plaintiff advances two arguments to save his strict liability claim from the preemptive effect of the Labeling Act's Section 1334(b) and the Supreme Court's holding in *Cipollone*: (1) that *Cipollone* is not binding authority and may be disregarded by this Court, and (2) even if *Cipollone* is binding, his failure-to-warn claim still survives because it is not based on "advertising or promotion."

Although courts are not bound to follow the preemption test adopted by the four-Justice plurality opinion, other federal courts of appeal have applied the holding in *Cipollone* as binding precedent. *See, e.g.*, *Spain v. Brown & Williamson Tobacco Corp.*, 363 F.3d 1183 (11th Cir. 2004); *Glassner v. R.J. Reynolds Tobacco Co.*, 223 F.3d 343 (6th Cir. 2000); *Philip Morris, Inc. v. Harshbarger*, 122 F.3d 58 (1st Cir. 1997); *Michael v. Shiley, Inc.*, 46 F.3d 1316 (3d Cir. 1995), *overruled on other grounds*, *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 492 (1996); *MacDonald v. Monsanto Co.*, 27 F.3d 1021 (5th Cir. 1994). Additionally, we have repeatedly relied upon *Cipollone* in our jurisprudence. *See, e.g.*, *Lindsey*, 195 F.3d at 1069 (interpreting and relying upon *Cipollone* in holding a ban on outdoor tobacco advertising preempted); *Harris v.*

*Ford Motor Co.*, 110 F.3d 1410, 1413 (9th Cir. 1997) (relied on plurality opinion in *Cipollone* in determining that product liability claim was preempted); *Taylor AG Indus. v. Pure-Gro*, 54 F.3d 555, 560 (9th Cir. 1995) (recognizing that "[w]e look to *Cipollone* for guidance in order to determine whether Appellants' failure to warn claim is preempted").

**[3]** Looking to *Cipollone* for guidance we must conclude that Rivera's failure-to-warn claim is not preempted by the Labeling Act. A claim is expressly preempted if the predicate duty underlying the claim constitutes: (1) a requirement or prohibition, (2) based on smoking and health, (3) imposed under state law, (4) with respect to the advertising or promotion of cigarettes. *Cipollone*, 505 U.S. at 523-24. Rivera asserts that Philip Morris failed in its duty to warn consumers about the dangers of using its product, including the addictive nature of nicotine, the manipulation of nicotine levels in cigarettes, and the carcinogenic effect of smoking. According to Rivera, the duty to warn about such information is unrelated to "advertising or promotion." His claim is based on Philip Morris' failure to employ non-promotional communications, such as public service announcements, to adequately warn consumers of the specific hazards of smoking. In support of his claim, he introduced examples of so-called advocacy statements by Philip Morris, including the purchase of newspaper space for making public announcements and issuing press releases.

Philip Morris counters that any claim that it should have provided more information than was required on the federally mandated warning labels necessarily challenges the adequacy of those labels and is therefore preempted. *See Papike v. Tambrands, Inc.*, 107 F.3d 737, 743 (9th Cir. 1997) (holding that a failure to warn claim was preempted under the Medical Devices Amendments to the Food, Drug & Cosmetic Act because the claim involved, in part, mandating that the manufacturer of tampons add a variety of warning statements not required by federal regulation); *Taylor*, 54 F.3d at 561 (hold-

ing that claims that point-of-sale signs, consumer notices, and other informational materials inadequately warned consumers were preempted under the Federal Insecticide, Fungicide, and Rodenticide Act because those claims challenged the adequacy of EPA-approved and mandated warnings on the product's labeling and packaging).

**[4]** Rivera does not, though, challenge the warnings Philip Morris actually gave pursuant to the Labeling Act. Rather, his claim addresses smoking harms outside the Act's reach, about which Philip Morris gave no warnings at all, but could have, through means other than advertising and promotion. His claim is thus unlike the claims in *Papike* and *Taylor*, where we held that plaintiffs' failure-to-warn claims regarding harms addressed in federally-regulated warning labels were preempted because the claims were "premised ultimately upon the inadequacy of the product label." *Taylor*, 54 F.3d at 561. Rivera's failure-to-warn claim is predicated on Nevada's common law duty that requires manufacturers to advise consumers of their products' dangers, a warning which is not necessarily required to be given through advertising or promotion. Since Nevada does not specify how manufacturers should warn consumers, Rivera's failure-to-warn claim is not preempted as long as it (1) does not challenge a substantive warning issued pursuant to the Act, and (2) is not based on Philip Morris' packaging, advertising, or promotional material.

Philip Morris also relies on a line of cases which hold that any claim requiring public release or disclosure of information is necessarily related to advertising and promotion. *Johnson v. Brown & Williamson Tobacco Corp.*, 122 F. Supp. 2d 194, 201 (D. Mass. 2000) (holding that any communication from a cigarette manufacturer to the public constitutes "advertising or promotion" under the Labeling Act); *Sonnenreich v. Philip Morris, Inc.*, 929 F. Supp. 416, 419 (S.D. Fla. 1996) (holding that any attempt by cigarette manufacturers to notify their customers of the dangers of smoking is the equivalent of

an advertising or promotional campaign because the same techniques are employed even though the goal is to discourage smoking); *Lacey v. Lorillard Tobacco Co.*, 956 F. Supp. 956, 964 (N.D. Ala. 1997) ("[A] claim that the defendant has a duty to disclose additional information concerning cigarette ingredients unavoidably attacks defendants' advertising and promotion" and is inextricably related to smoking and health); *Griesenbeck v. Am. Tobacco Co.*, 897 F. Supp. 815, 823 (D.N.J. 1995) ("A company's attempt to notify its mass market of anything, whether a danger warning or a marketing effort, is considered 'advertising or promotion' under the general usage of those terms, and a state cannot impose requirements on such activities without running afoul of the clear language of *Cipollone*.").

This broad interpretation of the phrase "advertising or promotion" does not comport with the language of *Cipollone*, nor does it square with the language and legislative history of the Labeling Act. By preserving some claims in *Cipollone* that were based, in part, on the duty to communicate smoking and health information to the public (e.g., the communicative duties arising from voluntary activities and research activities), the plurality envisioned continued avenues for cigarette manufacturers to perform those duties through means other than the rigorously controlled avenues of advertising, promotion, and packaging. *See Harshbarger*, 122 F.3d at 75-76 (viewing the broad constructions given to the phrase "advertising and promotion" with "skepticism"). Further, a fair but narrow reading of Section 1334(b) does not support the conclusion that the only method for a cigarette manufacturer to communicate directly with the public in general, and smokers in particular, is by way of packaging, advertising, and promotional materials. If there were no other way for a manufacturer to communicate with consumers regarding the dangers of smoking, the limiting "advertising or promotion" phrase in Section 1334(b) would be mere surplusage. Finally, as the First Circuit has noted, the legislative history's "repeated references to the 'narrow' and 'limited' nature of the preemption

provision," also cut against the plausibility of the construction we are urged to adopt. *Id.* at 76 (citing S. Rep. No. 91-566, at 2663 (1970), *reprinted in* 1970 U.S.C.C.A.N. 2663).

[5] A trier of fact could find that Philip Morris had an obligation to warn consumers of the health risks of smoking outside of packaging, advertising, and promoting. We conclude that imposing such an obligation would be consistent with a "fair but narrow" reading of the Labeling Act's Section 1334(b) and the plurality's decision in *Cipollone*. Further, the rationale of those cases holding that public service announcements, lobbying, seminars, or educational programs are necessarily promotional is open to question under *Cipollone*.

## (2) Fraudulent Concealment Claim

Rivera's fraudulent concealment claim is not preempted for similar reasons. Rivera alleges that Philip Morris engaged in fraud by failing to disclose information relating to the addictive qualities of smoking and the true nature and degree of the health hazards associated with cigarettes through media unrelated to the advertising or promotion of cigarettes, such as the industry-established Tobacco Industry Research Committee. A plurality of the Supreme Court in *Cipollone* agreed that fraudulent concealment claims escape preemption "insofar as those claims rely on a state-law duty to disclose . . . [material] facts through channels of communication other than advertising or promotion," such as state statutes requiring a cigarette manufacturer "to disclose material facts about smoking and health to an administrative agency." *Cipollone*, 505 U.S. at 528. The Supreme Court's nonexclusive example of a hypothetical state law mandating disclosure of health information to a state agency does not preclude recognition of a duty to disclose material facts which arises under Nevada's common law.

[6] The predicate of Rivera's fraudulent concealment claim is the general duty under Nevada law not to conceal state-

ments of material fact. The separate channel through which Philip Morris could communicate those facts was the TIRC, which was established specifically to inform the public of the health risks of tobacco use. Philip Morris' duty to disclose statements of material facts was imposed by state law and unrelated to the advertising or promotion of cigarettes. Rivera's fraudulent concealment claim is not preempted.[1]

## C.   Rivera's Substantive Claims

## (1)   Strict Liability Failure-to-Warn Claim

Having concluded that Rivera's strict liability claim is not preempted, we next determine whether his claim should have survived summary judgment. Rivera appeals the dismissal of his strict liability failure-to-warn claim, contending that the district court erred in two ways: first, by taking judicial notice of the fact that the dangers of smoking were commonly known after 1969, the year that the federal government strengthened the warning labels on cigarette packages and Mrs. Rivera started smoking; and second, by holding, as a matter of law, that after 1969 cigarettes were not unreasonably dangerous under Nevada law.

The parties agree that this strict product liability case is governed by Nevada law. Nevada has adopted the strict liability formula set forth in Section 402A of the Restatement (Second) of Torts. *See Forest v. E.I. DuPont de Nemours, & Co.*, 791 F. Supp. 1460, 1464 (D. Nev. 1992) ("In light of Nevada's explicit recognition of Section 402A, particularly in failure to warn cases, the court concludes that the Restatement

---

[1] In *Cipollone*, the Supreme Court insinuated that "state law" does not include legal duties imposed on voluntary acts. *See Cipollone*, 505 U.S. at 528 n.24. Thus, if Philip Morris' duty to disclose material facts "through channels of communication other than advertising or promotion" was voluntarily undertaken by the defendant, an action based on fraudulent concealment would not be preempted.

is authoritative in this jurisdiction."); *Stackiewicz v. Nissan Motor Corp.*, 686 P.2d 925, 928 (Nev. 1984); *Ward v. Ford Motor Co.*, 657 P.2d 95, 96 (Nev. 1983). In Nevada, strict liability is imposed on anyone who sells a product in a defective condition unreasonably dangerous to consumers. A product is defective when it fails to perform "in the manner reasonably to be expected in the light of its nature and intended function." *Ward*, 657 P.2d at 96; *see also Ginnis v. Mapes Hotel Corp.*, 470 P.2d 135, 138 (Nev. 1970). A product may be considered unreasonably dangerous if consumers are inadequately warned of an anticipated danger posed by a product of which the average consumer would not already be aware. *Yamaha Motor Co. v. Arnoult*, 955 P.2d 661, 665 (Nev. 1998).

**[7]** To state a cause of action for strict product liability in Nevada, Rivera must show that: (1) the product has a defect which rendered it *unreasonably dangerous*, (2) the defect existed at the time the product left the manufacturer, and (3) the defect caused Mrs. Rivera's injury. *Fyssakis v. Knight Equip. Corp.*, 826 P.2d 570, 571 (Nev. 1992). Under the Restatement approach to strict liability, a product is considered unreasonably dangerous when it is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary *knowledge common* to the community as to its characteristics." Rest. (2d) Torts § 402A cmt. i (1965) (emphasis added). This test explicitly incorporates the "common knowledge" doctrine, which rests upon the premise that a product is not unreasonably dangerous if everyone knows of its inherent dangers.

The district court took judicial notice of the fact that the health risks and addictive nature of smoking have been common knowledge in Nevada and, as a matter of law, concluded that cigarettes were not unreasonably dangerous. According to Philip Morris, courts have repeatedly dismissed claims brought by cigarette smokers because information regarding the health risks of smoking, including addiction, have long

been available to, and known by, the public. Philip Morris argues that the district court correctly took judicial notice of this past awareness and granted dismissal of Rivera's strict liability claim.

The Federal Rules of Evidence allow for judicial notice of a fact that is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). The notes of the advisory committee with regard to Federal Rule of Evidence 201 explain that "[a] high degree of indisputability is the essential prerequisite" to taking judicial notice of adjudicative facts and that "the tradition [of taking judicial notice] has been one of caution in requiring that the matter be beyond reasonable controversy." Fed. R. Evid. 201(a) & (b) advisory committee's notes. "Because the effect of judicial notice is to deprive a party of an opportunity to use rebuttal evidence, cross-examination, and argument to attack contrary evidence, caution must be used in determining that a fact is beyond controversy under Rule 201(b)." *Wright v. Brooke Group Ltd.*, 114 F. Supp. 2d 797, 816 (N.D. Iowa 2000).

**[8]** The Nevada courts have not determined whether the common knowledge doctrine in the context of tobacco litigation would defeat Rivera's strict liability claim as a matter of law. We therefore "make a reasonable determination of the results the highest state court would reach if it were deciding the case." *Aetna Cas. & Sur. Co. v. Sheft*, 989 F.2d 1105, 1108 (9th Cir. 1993). Would Nevada courts take judicial notice of the fact that all the risks of smoking were commonly known after 1969, four years after federal law first mandated warning labels on cigarette packages and the same year those warnings were strengthened, is the question. *See, e.g.*, *Hearn v. R.J. Reynolds Tobacco Co.*, 279 F. Supp. 2d 1096, 1107 (D. Ariz. 2003). "Other courts considering this very issue have reached different results regarding when, if at all, assorted

risks, namely general disease-related risks and risks of addiction, associated with smoking became common knowledge." *Wright*, 114 F. Supp. 2d at 811.

Philip Morris urges us to hold, as a matter of law, that the dangers of smoking were commonly known by 1969. In *Guilbeault v. R.J. Reynolds Tobacco Co.*, 84 F. Supp. 2d 263 (D.R.I. 2000), the court concluded:

> [A]fter thoroughly reviewing the facts regarding the evolution of the public's knowledge of smoking-related dangers, the Court is satisfied that it can take judicial notice of the community's common knowledge of the general disease-related health risks associated with smoking, including the risk of contracting cancer, as of 1964.

*Id.* at 273. Several courts have also taken this approach and held, as a matter of law, that by 1969 there was common knowledge of the evils of smoking. *See, e.g.*, *Glassner*, 223 F.3d at 351-52 (holding that plaintiff's strict liability claims were barred as a matter of law because, between the time when the decedent began smoking in 1969 and when she died in 1997, "there existed a widespread public awareness of the health risks associated with smoking"); *Allgood v. R.J. Reynolds Tobacco Co.*, 80 F.3d 168, 172 (5th Cir. 1996); *Roysdon v. R.J. Reynolds Tobacco Co.*, 849 F.2d 230, 236 (6th Cir. 1988) (applying common knowledge doctrine to affirm grant of summary judgment to defendant on plaintiff's product liability claims spanning 1974 to 1984); *Hollar v. Philip Morris Inc.*, 43 F. Supp. 2d 794, 807 (N.D. Ohio 1993) (dismissing two plaintiffs' product liability claims, who began smoking in 1968 and 1971 respectively).

Other courts deciding the issue have drawn a distinction between common knowledge of the general health hazards of smoking versus the common knowledge of specific illnesses or injuries allegedly caused by smoking. For example, in

*Tompkin v. Am. Brands*, 219 F.3d 566, 572 (6th Cir. 2000), the Sixth Circuit reversed the district court's grant of summary judgment in favor of the defendant tobacco companies, holding that whether the dangers of smoking, namely the link between smoking and lung cancer, were common knowledge between 1950 and 1965 presented a question of fact for the jury. In reaching this decision, the court expressly stated:

> The pertinent issue here is not whether the public knew that smoking was hazardous to health at some undifferentiated level, but whether it knew of the specific linkages between smoking and lung cancer.

*Id.* at 572. The court narrowed the common knowledge inquiry to the question of whether the link between cigarette smoking and lung cancer was common knowledge, not merely whether the link between cigarette smoking and general health maladies was common knowledge. The court explained its reason for narrowing the inquiry:

> It is one thing to be aware generally that a product might have an attenuated and theoretical connection with a deadly disease like lung cancer; it is another altogether to comprehend that it is the cause of an overwhelming majority of lung cancer cases. The "common knowledge" requirement is emasculated if a defendant may show merely that the public was aware that a product presented health risks at some vague, unspecified, and undifferentiated level.

*Id.* (internal citation omitted).

[9] The issue is unresolved in Nevada, but there is a basis to conclude that Nevada courts would narrow the inquiry and distinguish between knowing about general health risks of smoking and knowing about specific risks, like lung cancer or addiction, caused by tobacco products. *See Allison v. Merck & Co., Inc.*, 878 P.2d 948, 952-56 (Nev. 1994) (plurality

opinion) (recognizing Nevada's long-standing public policy grounds for holding manufacturers and distributors of defective products responsible for injuries caused by the defective products and rejecting the concept of "unavoidably unsafe products" as an exception to the rules of strict liability). Such an inquiry is a question of fact to be decided by a jury. *See Tompkin*, 219 F.3d at 572. Rivera alleged that Philip Morris' tobacco products proximately caused the decedent's lung cancer. The common knowledge inquiry should have been narrowed to whether the link between cigarette smoking and lung cancer was common knowledge, not simply whether the link between smoking and general health hazards was well-known. It is at least premature on this record to take judicial notice of the fact that the link between smoking and specific illnesses allegedly caused by smoking was common knowledge during the relevant time.

Philip Morris urges us to affirm the district court based on the evidentiary record. The test for whether a product is "unreasonably dangerous" is an objective determination and is measured by the "ordinary consumer" for whom the product is designed. *See McLennan v. Am. Eurocopter Corp.*, 245 F.3d 403, 428, (5th Cir. 2001); *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 599 (7th Cir. 2000). To get past summary judgment, Rivera needed to present evidence showing that the ordinary consumer was unaware of the link between smoking and lung cancer after 1969 (i.e., the defendant's product was more dangerous than was contemplated by the ordinary consumer).

**[10]** Rivera, through Marvin E. Goldberg, Ph.D., submitted an expert report highlighting public opinion polls conducted in 1970 and 1999 which found that "[o]ver half (53%) of smokers believed that smoking was not hazardous or that only heavy smoking was hazardous." Dr. Goldberg's report also discussed various studies conducted by the tobacco industry that were allegedly concealed from the public but confirmed "the relationship between heavy and prolonged tobacco smok-

ing and the incidence of cancer of the lung." An inference can be drawn from this evidence that if the tobacco industry purposefully suppressed scientific findings which were supportive of a link between tobacco and cancer, then it is less likely that the ordinary consumer could have known of the connection between smoking and lung cancer. We cannot weigh evidence. The evidence, and the favorable inferences to be drawn from it, is sufficient to question whether ordinary consumers were aware of the association between smoking and lung cancer, and the requisite presumptions on summary judgment leave the question to a trier of fact. *See, e.g.*, *Tompkin*, 219 F.3d at 568-70 (plaintiff's expert reviewed periodicals, polls, and industry and government reports from the relevant period, concluding that smokers were not adequately informed of the risks); *Little v. Brown & Williamson Tobacco Corp.*, 243 F. Supp. 2d 480, 492-95 (D.S.C. 2001) (plaintiff's "sample authorities," including journals, reports, and polls created a jury question regarding common knowledge).

Rivera also argues that the typical consumer was unaware in 1969 that smoking was addictive. "The idea is that the first cigarettes don't cause cancer, but they do make you crave more cigarettes and those additional cigarettes are the ones that cause cancer down the road." *Insolia*, 216 F.3d at 601. In other words, it is "really the addiction that kills — not smoking." *Id.* To protect his claim from summary judgment, Rivera was required to proffer evidence that tobacco's addictive nature was generally unknown to the typical consumer during the time in question. Rivera provided expert testimony from Dr. Goldberg stating that the tobacco industry, including Philip Morris, understood the addictive properties of nicotine yet acknowledged that "[v]ery few consumers are aware of the effects of nicotine, i.e. it's [sic] addictive nature and that nicotine is a poison." Rivera also relied on an expert report from Neal Benowitz, M.D., opining that the tobacco industry was aware of the addictiveness of smoking long before public health officials identified smoking's addictive danger. Rivera's point is that if health officials did not conclude that smok-

ing was addictive until well after 1969, then the ordinary consumer could not have known in 1969 that smoking was addictive.

**[11]** Philip Morris, on the other hand, submitted affidavits and reports from two experts, both of whom concluded that the hazards of smoking, including lung cancer and addiction, have been commonly known since well before 1969. Some of Rivera's own experts did not challenge these conclusions and, in one instance, supported a finding of common knowledge as to the risk of contracting lung cancer from smoking. We recognize that a trier of fact can reject expert testimony, but the evidence in the record, though slight, is sufficient to survive summary judgment and raise a question for a trier of fact. *See Texas v. Am. Tobacco Co.*, 14 F. Supp. 2d 956, 966 (E.D. Tex. 1997); *Castano v. Am. Tobacco Co.*, 961 F. Supp. 953, 958 n.7, 959 (E.D. La. 1997); *Am. Tobacco Co., Inc. v. Grinnell*, 951 S.W.2d 420, 429 (Tex. 1997).

## (2)   Fraudulent Concealment

Rivera claims that Philip Morris fraudulently concealed the link between smoking and lung cancer. In Nevada, the elements of fraudulent concealment are:

> (1)   the defendant concealed or suppressed a material fact; (2) the defendant was under a duty to disclose the fact to the plaintiff; (3) the defendant intentionally concealed or suppressed the fact with the intent to defraud the plaintiff; that is, the defendant concealed or suppressed the fact for the purpose of inducing the plaintiff to act differently than she would have if she had known the fact; (4) the plaintiff was unaware of the fact and would have acted differently if she had known of the concealed or suppressed fact; (5) and, as a result of the concealment or suppression of the fact, the plaintiff sustained damages.

*Dow Chem. Co. v. Mahlum*, 970 P.2d 98, 110 (Nev. 1998), *overruled in part on other grounds*, *GES, Inc. v. Corbitt*, 21 P.3d 11 (Nev. 2003). The district court alternatively granted summary judgment on Rivera's fraudulent concealment claim because there was no evidence that any action on the part of Philip Morris would have altered Mrs. Rivera's decisions regarding smoking.

**[12]** To sustain a claim for fraud based on concealment or omission, Rivera was required to present evidence showing that the fraud victim would have acted differently if there had not been fraudulent concealment. *Nev. Power Co. v. Monsanto Co.*, 891 F. Supp. 1406, 1417 (D. Nev. 1995). The record is void of any evidence that Mrs. Rivera would have acted differently if the omitted information had been disclosed. According to deposition testimony, Mrs. Rivera began smoking because her friends smoked and it was "cool" to smoke. This does not mean, necessarily, that Mrs. Rivera still would have elected to begin smoking in order to be "cool" if the health risks of smoking had been known. Rivera, however, has not presented evidence alleging that his wife would not have started to smoke but-for the concealment of this information. Moreover, Rivera testified that his late wife's failure to quit smoking was not dependent upon anything Philip Morris could have said or done; no amount of warning could have induced her to quit. We affirm the district court's summary judgment on the fraudulent concealment claim because Rivera has not supported a required element of this cause of action.

## (3)   Misrepresentation Claim

**[13]** Rivera claims that the defendant made affirmative misrepresentations regarding the health risks of smoking. False representation claims, whether or not they allege misrepresentation in advertising and promotional materials, are not preempted by the Labeling Act because they are based on a general duty not to deceive. *Cipollone*, 505 U.S. at 527-28. The district court granted summary judgment as to the fraudu-

lent misrepresentation claim because no evidence showed that the decedent ever saw, heard, or read and relied upon any alleged misrepresentation made by Philip Morris.

Under Nevada law, the elements of fraud are: (1) a false representation made by the defendant; (2) defendant's knowledge or belief that the representation was false (or insufficient basis for making the representation); (3) defendant's intention to induce the plaintiff to act or refrain from acting in reliance upon the misrepresentation; (4) plaintiff's justifiable reliance upon the misrepresentation; and (5) damage to the plaintiff resulting from such reliance. *Bulbman, Inc. v. Nev. Bell*, 825 P.2d 588, 592 (Nev. 1992). In addition, Rivera must prove each element of fraud by clear and convincing evidence. *Id.*

Philip Morris contends that the allegation of fraudulent conduct must fail as a matter of law because Rivera cannot show that the decedent justifiably relied on any representation made by the defendant. To establish justifiable reliance, Rivera must show that an alleged false representation played a material and substantial part in leading his late wife to adopt her particular course. *See Blanchard v. Blanchard*, 839 P.2d 1320, 1322 (Nev. 1992). Of course, reliance on an alleged misrepresentation presumes that Mrs. Rivera had actually read or heard the alleged misrepresentation. *See Nev. Power Co.*, 891 F. Supp. at 1414.

**[14]** Rivera filed this lawsuit after his wife died. The record contains no admissible evidence identifying what statements attributable to Philip Morris the decedent actually saw, heard, or read and relied upon to support her decision to start and continue smoking. During discovery, Rivera admitted that he was:

> unable to point to a specific statement in any advertisement or public communication from [Defendant] which influenced Mrs. Rivera's decision to start, continue or fail to quit smoking.

**[15]** Rivera argues that the pervasiveness of Philip Morris' advertisements creates an issue of material fact as to whether his late wife saw those advertisements and relied upon them. The mere pervasiveness of the advertisements is insufficient to counter the plaintiff's testimony. During his deposition, Rivera could not identify any misrepresentation by Philip Morris that his late wife saw or relied upon in deciding to smoke cigarettes in general and Marlboro cigarettes in particular. Reliance is an essential element of a misrepresentation claim. Summary judgment on that claim was appropriate.

We affirm in part and remand for further proceedings. In doing so, we do not preclude further pretrial considerations that might rebut the presumptions that must be overcome to justify summary judgment. Each party shall bear its own costs.

AFFIRMED IN PART AND REMANDED.